# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Corbin R. Davis

*In re* SANDERS

Docket No. 146680. Argued November 7, 2013 (Calendar No. 6). Decided June 2, 2014.

The Department of Human Services (DHS) petitioned the Jackson Circuit Court, Family Division, to assume jurisdiction over the minor children of Tammy Sanders and Lance Laird after the youngest child was born with drugs in his system. The court, Richard N. LaFlamme, J., removed the child from Sanders's custody and placed him with Laird, who at the time also had custody of the older child. The DHS subsequently filed an amended petition, alleging that Laird had tested positive for cocaine, that Sanders had admitted using drugs with Laird, and that Sanders had spent the night at Laird's home despite a court order that prohibited her from having unsupervised contact with the children. At the preliminary hearing, the court removed the children from Laird's custody and placed them with the DHS. Laird contested the allegations in the amended petition and requested an adjudication with respect to his fitness as a parent. Sanders pleaded no contest to the allegations of neglect and abuse in the amended petition, but Laird declined to enter a plea and instead repeated his demand for an adjudication and requested that the children's temporary placement be changed from their aunt to their paternal grandmother, with whom Laird resided. At a placement hearing, Laird admitted that he had allowed Sanders to spend one night at his house after the court removed the children from her custody but asserted that the children never saw her that night. Laird also testified that he was on probation for a domestic violence conviction. The court took the placement motion under advisement and maintained placement of the children with their aunt pending Laird's adjudication. A few weeks later, the DHS dismissed the remaining allegations against Laird, and his adjudication was canceled. Following a review hearing, the court ordered Laird to comply with a service plan, including parenting classes, a substance-abuse assessment, counseling, and a psychological evaluation; restricted his contact with the children to supervised parenting time; and continued placement of the children with their aunt. Laird subsequently moved for immediate placement of the children with him, arguing that the court had no authority to condition the placement of his children on his compliance with a service plan because he had not been adjudicated as unfit. The court denied the motion, relying on the one-parent doctrine derived from *In re CR*, 250 Mich App 185 (2002), which provides that if jurisdiction has been established by the adjudication of only one parent, the court may then enter dispositional orders affecting the parental rights of both parents. The Court of Appeals denied Laird's application for interlocutory leave to appeal in an unpublished order, entered January 18, 2013 (Docket No. 313385). The Supreme Court granted Laird leave to appeal. 493 Mich 959 (2013).

In an opinion by Justice MCCORMACK, joined by Chief Justice YOUNG and Justices CAVANAGH, KELLY, and ZAHRA, the Supreme Court *held*:

Application of the one-parent doctrine impermissibly infringes the fundamental rights of unadjudicated parents without providing adequate process, and the doctrine is consequently unconstitutional under the Due Process Clause of the Fourteenth Amendment. Due process requires a specific adjudication of a parent's unfitness before the state can infringe that parent's constitutionally protected parent-child relationship.

1. MCL 712A.2(b) governs child protective proceedings generally. MCL 712A.2(b)(1) gives the family court jurisdiction over a child in cases of parental abuse or neglect. Child protective proceedings have two phases: the adjudicative phase and the dispositional phase. Generally, the court determines during the adjudicative phase whether it can take jurisdiction over the child in the first place. Once the court has jurisdiction, it determines during the dispositional phase what course of action will ensure the child's safety and well-being. With respect to the adjudicative phase, once the court authorizes a petition containing allegations of abuse or neglect, the respondent parent can admit the allegations, plead no contest to them, or request a trial (the adjudication) and contest the merits of the petition. If there is a trial, (1) the parent is entitled to a jury, (2) the rules of evidence generally apply, and (3) the petitioner must prove by a preponderance of the evidence one or more of the statutory grounds for jurisdiction alleged in the petition. When the allegations are proved by a plea or at the trial, the adjudicated parent is determined to be unfit. Under MCR 3.973(A) and MCL 712A.6, the purpose of the dispositional phase is to then determine what measures the court will take with respect to a child properly within its jurisdiction and, when applicable, against any adult. Unlike the adjudicative phase, the rules of evidence do not apply and the parent is not entitled to a jury determination of facts. The dispositional phase ultimately ends with a permanency planning hearing, which results in either the dismissal of the original petition and family reunification or the court's ordering the DHS to file a petition for the termination of parental rights.

2. The one-parent doctrine permits the family court to obtain jurisdiction over a child on the basis of the adjudication of either parent and then proceed to the dispositional phase with respect to both parents. The doctrine therefore eliminates the petitioner's obligation to prove that the unadjudicated parent is unfit before that parent is subject to the dispositional authority of the court.

3. Included in the Fourteenth Amendment's promise of due process is a substantive component that provides heightened protection against governmental interference with fundamental rights and liberty interests, including the right of parents to make decisions concerning the care, custody, and control of their children. A parent's right to control the custody and care of his or her children is not absolute because the state has a legitimate interest in protecting the children's moral, emotional, mental, and physical welfare, and in some circumstances neglectful parents may be separated from their children. The United States Constitution, however, recognizes a presumption that fit parents act in the best interests of their children and that there will normally be no reason for the state to insert itself into the private realm of the family to further question the ability of fit parents to make the best decisions concerning the rearing of their children. Due process demands that an individual be afforded

minimal procedural protections before the state can burden a fundamental right, and the three-part balancing test of *Mathews v Eldridge*, 424 US 319 (1976), is applied to determine what process is due when the state seeks to curtail or infringe an individual right. The test requires consideration of three factors: (1) the private interest that the official action will affect, (2) the risk of an erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards, and (3) the state's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. In essence, the test balances the costs of certain procedural safeguards (in this case, an adjudication) against the risks of not adopting those procedures.

4. In *CR*, the Court of Appeals interpreted MCR 3.973(A) as permitting the family court to enter dispositional orders affecting the rights of any adult, including the parental rights of unadjudicated parents, as as long as the court had established jurisdiction over the child. According to the DHS, the requirement of a dispositional phase obviated an unadjudicated parent's right to a fitness hearing. Applying the three-part *Mathews* test, however, led to the conclusion that dispositional hearings are constitutionally insufficient and that due process requires that every parent receive an adjudication hearing before the state can interfere with his or her parental rights. The private interest at stake is a core liberty interest recognized by the Fourteenth Amendment. With respect to the second and third *Mathews* factors, the state has an interest in protecting the health and safety of minors, which will, in some circumstances, require temporary placement of a child with a nonparent. This interest runs parallel with the state's interest in maintaining the integrity of the family unit whenever possible, however, and the state's interest is undermined when a parent is erroneously deprived of his or her fundamental right to parent a child. The state has an equally strong interest in ensuring that a parent's fitness or lack thereof is resolved before the state interferes with the parent-child relationship. Therefore, the probable value of extending the right to an adjudication to each parent in a child protective proceeding benefits both public and private interests. While requiring adjudication of each parent will increase the burden on the state in many cases, an adjudication would significantly reduce any risk of the erroneous deprivation of the parent's right. The adjudication is the only fact-finding phase regarding parental fitness, and the procedures afforded parents are tied to the allegations of unfitness in the petition, protecting them from the risk of erroneous deprivation of their parental rights. Dispositional hearings do not serve this same function because the court is concerned at that time only with what services and requirements will be in the children's best interests. There is no presumption of fitness in favor of the unadjudicated parent. The procedures during the dispositional phase are not related to the allegations of unfitness because the question before the court at a dispositional hearing assumes a previous finding of parental unfitness. Therefore, while extending the right to an adjudication to all parents will impose additional burdens on petitioners, those burdens do not outweigh the risks associated with depriving a parent of that right without any determination that he or she is unfit, as the one-parent doctrine allows. The one-parent doctrine is therefore unconstitutional and *In re CR* is overruled.

5. Laird's current incarceration for violating federal drug-trafficking laws did not render his complaint moot. Incarcerated parents can exercise the constitutional right to direct the care of their children while incarcerated, and Laird had tried to do just that, requesting several times

during the proceedings below that the children be placed with their parental grandmother. As long as the children are provided adequate care, state interference with those decisions is not warranted.

Trial court order vacated and case remanded for further proceedings.

Justice MARKMAN, joined by Justice VIVIANO, dissenting, stated that the issue was whether the Legislature acted in an unconstitutional manner by enacting statutes that for more than 70 years have provided the underpinnings for the one-parent doctrine. Although Justice MARKMAN agreed with the majority that all parents are entitled to due process in the child protective context, with the presumption of fitness and the burden of proof to the contrary resting on the state, he saw no constitutional barriers to the long-established procedures in Michigan that guarantee that such a fitness determination is fairly made. He concluded that *CR* correctly held that the one-parent doctrine, as well as the statutes and court rules on which the doctrine was grounded, were constitutional and would have affirmed the family court. In its opinion the majority only perfunctorily referred to its threshold obligation to presume the constitutionality of statutes and court rules and did not accord any weight to the good-faith judgments of the Legislature. While Justice MARKMAN agreed with the majority that absent exigent circumstances, the state cannot remove a child from a parent's custody or otherwise interfere with a parent's parental rights unless a court first finds that the parent is unfit, he did not believe that the statutory scheme (which includes the one-parent doctrine) allows the state to do so. The statutory provisions and the court rules presume that parents are fit and require the state to prove a parent's unfitness before the state can remove a child from the parent's custody. Once the court adjudicates one parent pursuant to MCL 712A.2(b), however, the court can exercise jurisdiction over the child and, pursuant to MCL 712A.6, enter any orders affecting adults that the court determines are necessary for the physical, mental, or moral well-being of the child. If a child is being abused or neglected, it is imperative that a court have the power to intervene immediately and effectively. The issue in this case concerned the propriety of an unadjudicated parent being deprived of the adjudicative phase of a child protective proceeding. The adjudicative phase only determines whether the court has jurisdiction over the child. It is the initial phase in which the court acquires jurisdiction in order to attempt to alleviate the problems in the home so that the children and the parents can be reunited. A finding of jurisdiction does not necessarily or immediately foreclose the parent's rights to his or her child, and not every adjudicative hearing results in removal of custody. Once a jury has determined that one parent has abused or neglected a child, however, that child should not have to wait for a secure placement until a determination, following an additional jury trial, that the other parent also abused or neglected the child. Abolishing the one-parent doctrine will cost the state in terms of time, financial resources, and social-services manpower because the state will now have to adjudicate both parents as unfit before a court can even exercise jurisdiction over abused and neglected children. Most troubling are the additional costs and burdens that will now be placed on abused and neglected children, who are in the greatest need of expedited public protection but will be given that protection considerably less quickly because both parents are for the first time constitutionally entitled to jury trials. Although the majority addressed at length the parental interests involved in the case, it mentioned in only the most peremptory way the existence of the children's interests. While the majority apparently believed the most important (if not the exclusive) constitutional interest involved was that of the parent, Justice MARKMAN believed that

the most important (albeit not the exclusive) constitutional interest involved was that of the children. He disagreed that both parents are constitutionally entitled to a jury trial on their fitness before children can be placed within the protective jurisdiction of the court. The Legislature adequately protected the due process rights of an unadjudicated parent of an abused or neglected child by requiring a hearing on the parent's fitness before the state can interfere with his or her parental rights, and Laird was reasonably determined to be unfit after several such hearings in this case.

©2014 State of Michigan

# Opinion

Chief Justice:          Justices:
Robert P. Young, Jr.    Michael F. Cavanagh
                        Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano

FILED June 2, 2014

STATE OF MICHIGAN

SUPREME COURT

_____

*In re* SANDERS, Minors.

_____

DEPARTMENT OF HUMAN SERVICES,

        Petitioner-Appellee,

v                                                     No. 146680

LANCE LAIRD,

        Respondent-Father-Appellant,

and

TAMMY SANDERS,

        Respondent-Mother,

_____

BEFORE THE ENTIRE BENCH

MCCORMACK, J.

At issue in this case is the constitutionality of Michigan's one-parent doctrine.

The one-parent doctrine permits a court to interfere with a parent's right to direct the

care, custody, and control of the children solely because the other parent is unfit, without any determination that he or she is also unfit. In other words, the one-parent doctrine essentially imposes joint and several liability on both parents, potentially divesting either of custody, on the basis of the unfitness of one. Merely describing the doctrine foreshadows its constitutional weakness.

In the case before us, upon petition by the Department of Human Services (DHS), the trial court adjudicated respondent-mother, Tammy Sanders, as unfit but dismissed the allegations of abuse and neglect against respondent-appellant-father, Lance Laird. Laird moved for his children to be placed with him. Although Laird was never adjudicated as unfit, the trial court denied Laird's motion, limited his contact with his children, and ordered him to comply with a service plan. In justifying its orders, the court relied on the one-parent doctrine and the Court of Appeals' decision in *In re CR*, 250 Mich App 185; 646 NW2d 506 (2002), from which that doctrine derives.

Laird believes that the one-parent doctrine violates his fundamental right to direct the care, custody, and control of his children because it permits the court to enter dispositional orders affecting that right without first determining that he is an unfit parent. We agree. Because application of the one-parent doctrine impermissibly infringes the fundamental rights of unadjudicated parents without providing adequate process, we hold that it is unconstitutional under the Due Process Clause of the Fourteenth Amendment.

I. FACTUAL AND PROCEDURAL BACKGROUND

Laird is the father of two boys: P, born in 2010, and C, born in 2011. Sanders is the boys' mother. Four days after C was born drug positive, the Jackson Circuit Court,

2

acting on a petition filed by the DHS, removed C from Sanders's custody and placed the child with Laird. At that time, P was also in Laird's custody.

Several weeks later, the DHS filed an amended petition alleging that Laird had tested positive for cocaine, that Sanders had admitted "getting high" with Laird, and that Sanders had spent the night at Laird's home despite a court order that prohibited her from having unsupervised contact with the children. At a November 16, 2011 preliminary hearing, the court removed the children from Laird's custody and placed them in the custody of the DHS.[1] Laird contested the allegations in the amended petition and requested an adjudication with respect to his fitness as a parent.

On February 7, 2012, Sanders pleaded no contest to the allegations of neglect and abuse in the amended petition. Laird declined to enter a plea and instead repeated his demand for an adjudication. Laird also moved to change the children's temporary placement from their paternal aunt to the children's paternal grandmother, with whom Laird then resided. The court conducted a placement hearing at which several witnesses, including Laird, testified. Laird admitted that he had allowed Sanders to spend one night at his house after the court removed the children from her custody. Laird claimed, however, that the children never saw Sanders that night. Laird also testified that he was on probation stemming from a domestic violence conviction. The court took the

---

[1] Consistently with the court rule governing pretrial placement of children in child protective proceedings, the DHS temporarily placed the children with their aunt. See MCR 3.965(C)(2) (" If continuing the child's residence in the home is contrary to the welfare of the child, the court shall not return the child to the home, but shall order the child placed in the most family-like setting available consistent with the child's needs.").

placement motion under advisement and maintained placement of the children with their aunt pending Laird's adjudication, which was scheduled for May 1, 2012.

A few weeks later, on April 18, 2012, the DHS dismissed the remaining allegations against Laird, and Laird's adjudication was cancelled. At a May 2, 2012 review hearing, the court ordered Laird to comply with services, including parenting classes, a substance-abuse assessment, counseling, and a psychological evaluation. Laird's contact with his children was restricted to supervised parenting time, and placement of the children continued with their aunt. On August 22, 2012, Laird moved for immediate placement of the children with him. Laird argued that the court had no legal authority to condition the placement of his children on his compliance with a service plan because he had not been adjudicated as unfit. The court, relying on the Court of Appeals' decision in *CR*, denied the motion.

Laird's application for interlocutory leave to appeal in the Court of Appeals was denied for lack of merit. *In re Sanders Minors*, unpublished order of the Court of Appeals, entered January 18, 2013 (Docket No. 313385). This Court granted leave to appeal to address "whether the application of the one-parent doctrine violates the due process or equal protection rights of unadjudicated parents." *In re Sanders*, 493 Mich 959 (2013).[2]

---

[2] After this Court granted leave to appeal, Laird was convicted in federal court of drug-trafficking charges. See 21 USC 841(a)(1) and (b)(1)(B).

4

## II. LEGAL BACKGROUND

### A. STANDARD OF REVIEW

Whether child protective proceedings complied with a parent's right to procedural due process presents a question of constitutional law, which we review de novo. *In re Rood*, 483 Mich 73, 91; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.). The interpretation and application of statutes and court rules are also reviewed de novo. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). Statutes are presumed to be constitutional, and we have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent. *Taylor v Gate Pharm*, 468 Mich 1, 6; 658 NW2d 127 (2003). We interpret court rules using the same principles that govern statutory interpretation. *Haliw v Sterling Hts*, 471 Mich 700, 704; 691 NW2d 753 (2005).

### B. CHILD PROTECTIVE PROCEEDINGS IN MICHIGAN

A brief review of the court rules and statutes governing child protective proceedings is helpful here. The juvenile code, MCL 712A.1 *et seq.*, establishes procedures by which the state can exercise its *parens patriae* authority over minors. These procedures are reflected in Subchapter 3.900 of the Michigan Court Rules. In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase. See *In re Brock*, 442 Mich 101, 108; 499 NW2d 752 (1993). Generally, a court determines whether it can take jurisdiction over the child in the first place during the adjudicative phase. *Id*. Once the court has jurisdiction, it determines during the dispositional phase what course of action will ensure the child's safety and well-being. *Id*.

The court's authority to conduct those proceedings is found at MCL 712A.2(b), which encompasses child protective proceedings generally. The first subsection of that statute provides the court with jurisdiction over a child in cases of parental abuse or neglect. MCL 712A.2(b)(1) (providing for jurisdiction over a juvenile whose parent "neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals"). To initiate a child protective proceeding, the state must file in the family division of the circuit court a petition containing facts that constitute an offense against the child under the juvenile code (i.e., MCL 712A.2(b)). MCL 712A.13a(2); MCR 3.961.[3] If the court authorizes the petition, the court may release the child to a parent, MCR 3.965(B)(12)(a), or, if the court finds that returning the child to the home would be contrary to the child's welfare, order that the child be temporarily placed in foster care, MCR 3.965(B)(12)(b) and (C). The respondent parent can either admit the allegations in the petition or plead no contest to them. MCR 3.971. Alternatively, the respondent may demand a trial (i.e., an adjudication) and contest the merits of the petition. MCR 3.972. If a trial is held, the respondent is entitled to a jury, MCR 3.911(A), the rules of evidence generally apply,

---

[3] While a petition is the ordinary route by which child protective proceedings begin, the juvenile code also recognizes that exigent circumstances can require immediate action. See MCL 712A.14a(1) (authorizing the immediate removal of a child without a court order "[i]f there is reasonable cause to believe that a child is at substantial risk of harm or is in surroundings that present an imminent risk of harm and the child's immediate removal from those surroundings is necessary to protect the child's health and safety"); see also MCL 712A.14b(1)(a) (allowing an ex parte order authorizing the DHS to immediately take a child into protective custody before any hearing if a petition alleges a similar "imminent risk of harm").

MCR 3.972(C), and the petitioner has the burden of proving by a preponderance of the evidence one or more of the statutory grounds for jurisdiction alleged in the petition, MCR 3.972(E). When the petition contains allegations of abuse or neglect against a parent, MCL 712A.2(b)(1), and those allegations are proved by a plea or at the trial, the adjudicated parent is unfit. While the adjudicative phase is only the first step in child protective proceedings, it is of critical importance because "[t]he procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation" of their parental rights. *Brock*, 442 Mich at 111.

Once a court assumes jurisdiction over a child, the parties enter the dispositional phase. Unlike the adjudicative phase, here the rules of evidence do not apply, MCR 3.973(E), and the respondent is not entitled to a jury determination of facts, MCR 3.911(A). The purpose of the dispositional phase is to determine "what measures the court will take with respect to a child properly within its jurisdiction and, when applicable, against *any* adult . . . ." MCR 3.973(A) (emphasis added). The court's authority to enter these orders is found in MCL 712A.6.

The court has broad authority in effectuating dispositional orders once a child is within its jurisdiction. *In re Macomber*, 436 Mich 386, 393-399; 461 NW2d 671 (1990). And while the court's dispositional orders must be "appropriate for the welfare of the juvenile and society in view of the facts proven and ascertained," MCL 712A.18(1), the orders are afforded considerable deference on appellate review, see *In re Cornet*, 422 Mich 274, 278-279; 373 NW2d 536 (1985) (adopting the clear-error standard of review for dispositional orders).

7

If certain requirements are met, the court can terminate parental rights at the initial dispositional hearing, MCR 3.977(E);[4] otherwise, the court continues to conduct periodic review hearings and may enter orders that provide for services, direct the child's placement, and govern visitation, MCR 3.973(F); MCR 3.974; MCR 3.975. Before the court enters any order of disposition, however, the DHS must prepare a case service plan that includes a "[s]chedule of services to be provided to the parent . . . to facilitate the child's return to his or her home . . . ." MCL 712A.18f(3)(d).[5] That case service plan must also "provide for placing the child in the most family-like setting available and in as close proximity to the child's parents' home as is consistent with the child's interests and special needs." MCL 712A.18f(3). The court examines the case service plan pursuant to MCL 712A.18f(4) and MCR 3.973(F)(2), and frequently adopts the DHS's case service plan and orders compliance with the services contained in the plan.

Ultimately, the dispositional phase ends with a permanency planning hearing, which results in either the dismissal of the original petition and family reunification or the court's ordering the DHS to file a petition for the termination of parental rights.

---

[4] Among other things, the petition must contain a request for termination, there must be adequate grounds for the court's jurisdiction, and the court must find by clear and convincing legally admissible evidence that grounds exist for termination under MCL 712A.19b(3).

[5] We note that the statute providing for case service plans, MCL 712A.18f, does not distinguish between adjudicated parents and unadjudicated parents.

## C. THE ONE-PARENT DOCTRINE

Because the jurisdictional inquiry is focused on the child, once there has been *an* adjudication, either by trial or by plea, the court has jurisdiction over the child regardless of whether one or both parents have been adjudicated unfit. MCL 712A.2(b). In cases in which jurisdiction has been established by adjudication of only *one* parent, the one-parent doctrine allows the court to then enter dispositional orders affecting the parental rights of *both* parents. The one-parent doctrine is the result of the Court of Appeals' interpretation of Subchapter 3.900[6] of the Michigan Court Rules in *CR*:

> [O]nce the family court acquires jurisdiction over the children, [MCR 3.973(A)] authorizes the family court to hold a dispositional hearing "to determine [what] measures [the court will take] . . . *against any adult* . . . ." [MCR 3.973(F)(2)] then allows the family court to "order compliance with all or part of the case service plan and [. . .] *enter such orders as it considers necessary in the interest of the child*." Consequently, after the family court found that *the children* involved in this case came within its jurisdiction on the basis of [the adjudicated parent's] no-contest plea and supporting testimony at the adjudication, the family court was able to order [the unadjudicated parent] to submit to drug testing and to comply with other conditions necessary to ensure that the children would be safe with him even though he was not a respondent in the proceedings. This process eliminated the [petitioner's] obligation to allege and demonstrate by a preponderance of legally admissible evidence that [the unadjudicated parent] was abusive or neglectful within the meaning of MCL 712A.2(b) before the family court could enter a dispositional order that would control or affect his conduct. [*CR*, 250 Mich App at 202-203.]

In simpler terms, the one-parent doctrine permits courts to obtain jurisdiction over a child on the basis of the adjudication of either parent and then proceed to the dispositional

---

[6] *CR* was decided when the court rules governing child protective proceedings and other proceedings relating to minors were located in former Subchapter 5.900 of the Michigan Court Rules. References to and quotations of former Subchapter 5.900 in *CR* have been updated to reflect the rules currently found in Subchapter 3.900.

phase with respect to both parents. The doctrine thus eliminates the petitioner's obligation to prove that the unadjudicated parent is unfit before that parent is subject to the dispositional authority of the court.

## D. CONSTITUTIONAL PARENTAL RIGHTS

The Fourteenth Amendment of the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." US Const, Am XIV, § 1. Included in the Fourteenth Amendment's promise of due process is a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v Glucksberg*, 521 US 702, 720; 117 S Ct 2258; 138 L Ed 2d 772 (1997). Among these fundamental rights is the right of parents to make decisions concerning the care, custody, and control of their children. See *Meyer v Nebraska*, 262 US 390, 399-400; 43 S Ct 625; 67 L Ed 1042 (1923). In the words of this Court, "[p]arents have a significant interest in the companionship, care, custody, and management of their children, and the interest is an element of liberty protected by due process." *In re JK*, 468 Mich 202, 210; 661 NW2d 216 (2003), citing *Brock*, 442 Mich at 109.

The right to parent one's children is "essential to the orderly pursuit of happiness by free men," *Meyer*, 262 US at 399, and "is perhaps the oldest of the fundamental liberty interests," *Troxel v Granville*, 530 US 57, 65; 120 S Ct 2054; 147 L Ed 2d 49 (2000) (opinion by O'Connor, J.). The right is an expression of the importance of the familial relationship and "stems from the emotional attachments that derive from the intimacy of

10

daily association" between child and parent. *Smith v Org of Foster Families for Equality & Reform*, 431 US 816, 844; 97 S Ct 2094; 53 L Ed 2d 14 (1977).

A parent's right to control the custody and care of her children is not absolute, as the state has a legitimate interest in protecting "the moral, emotional, mental, and physical welfare of the minor" and in some circumstances "neglectful parents may be separated from their children." *Stanley v Illinois*, 405 US 645, 652; 92 S Ct 1208; 31 L Ed 2d 551 (1972) (quotation marks and citation omitted). The United States Constitution, however, recognizes "a presumption that fit parents act in the best interest of their children" and that "there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of [fit parents] to make the best decisions concerning the rearing of [their] children." *Troxel*, 530 US at 68-69 (opinion by O'Connor, J.). Further, the right is so deeply rooted that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents . . . ." *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982).

The United States Supreme Court has also recognized that due process demands that minimal procedural protections be afforded an individual before the state can burden a fundamental right. In *Mathews v Eldridge*, the Supreme Court famously articulated a three-part balancing test to determine "what process is due" when the state seeks to curtail or infringe an individual right:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally,

11

the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [*Mathews v Eldridge*, 424 US 319, 333, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976).]

In essence, the *Eldridge* test balances the costs of certain procedural safeguards—here, an adjudication—against the risks of not adopting such procedures. The Supreme Court has regularly employed the *Eldridge* test to determine the nature of the process due in child protective proceedings in related contexts. See *Santosky*, 455 US at 758 ("Evaluation of the three *Eldridge* factors compels the conclusion that use of a 'fair preponderance of the evidence' standard in [parental rights termination] proceedings is inconsistent with due process."); *Smith*, 431 US at 848-852 (addressing New York City's procedures for removing a minor from a foster home).

Our due process inquiry is also informed by *Stanley v Illinois*, a pre-*Eldridge* case in which the Supreme Court held that the Fourteenth Amendment demands that a parent be entitled to a hearing to determine the parent's fitness before the state can infringe the right to direct the care, custody, and control of his or her children. *Stanley*, 405 US at 649. *Stanley* addressed an Illinois statutory scheme that declared the children of unmarried fathers, upon the death of the mother, to be dependents (i.e., wards of the state) without a fitness hearing at which neglect was proved.[7] The *Stanley* Court found this

---

[7] Under then-existing Illinois law, the state could take custody of a child in a dependency proceeding or in a neglect proceeding. "In a dependency proceeding [the state] may demonstrate that the children are wards of the State because they have no surviving parent or guardian. In a neglect proceeding it may show that children should be wards of the State because the present parent(s) or guardian does not provide suitable care." *Stanley*, 405 US at 649 (citations omitted). The statute defined "parents" as " 'the father and mother of a legitimate child, or the survivor of them, or the natural mother of an illegitimate child, and includes any adoptive parent,' " but did not include unmarried fathers. *Id*. at 650. Thus, the statute did not recognize Stanley as a parent, and it did not

12

scheme to be constitutionally infirm because it allowed the state to deprive Stanley of custody without first determining that he was unfit at a hearing:

> Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand.
>
> * * *
>
> . . . The State's interest in caring for Stanley's children is *de minimis* if Stanley is shown to be a fit father. [It] insists on presuming rather than proving Stanley's unfitness solely because it is more convenient to presume than to prove. Under the Due Process Clause that advantage is insufficient to justify refusing a father a hearing when the issue at stake is the dismemberment of his family. [*Id*. at 656-658.]

The rule from *Stanley* is plain: all parents "are constitutionally entitled to a hearing on their fitness before their children are removed from their custody." *Id*. at 658.

### III. ANALYSIS

At the onset, we note that the Court of Appeals' interpretation in *CR* of MCL 712A.6 and MCR 3.973(A) would seemingly grant trial courts unfettered authority to enter dispositional orders, as long as the court finds them to be in the child's best interests.[8] This Court, however, has a duty to interpret statutes as being constitutional

---

require the state to prove that Stanley was unfit in a neglect proceeding in order to deprive him of custody of his children.

[8] The dissent also emphasizes that MCL 712A.2(b)(1) refers singularly to "parent." This reference is consistent with the unremarkable idea that courts may assume jurisdiction over a child on the basis of the adjudication of one parent. Laird's challenge to the one-parent doctrine does not challenge this proposition because the one-parent doctrine is not concerned with the *assumption* of jurisdiction. In this case, for example, the trial court properly assumed jurisdiction over the children on the basis of Sanders's plea. See MCR

13

whenever possible. *Taylor*, 468 Mich at 6. Thus, if the Court of Appeals' interpretation permits trial courts to exercise their jurisdiction in a manner that impermissibly interferes with a parent's constitutional right to direct the care and custody of his or her child, as Laird argues, we are duty-bound to reject it.

## A. THE ONE-PARENT PROBLEM

Laird's primary argument is that the one-parent doctrine is unconstitutional because it allows courts to infringe the rights of unadjudicated parents to direct the care, custody, and control of their children without an adjudication that those parents are unfit. According to Laird, the facts of this case well illustrate the flaws inherent in the one-parent doctrine in practice. After the DHS filed the neglect petition, Sanders entered a no-contest plea to the allegations against her. This allowed the court to assume jurisdiction over Laird's children. The DHS did not pursue any allegations against Laird, despite his demand for a trial. His fitness was never the subject of any hearing, and he was never adjudicated as unfit. Nevertheless, the court refused to grant Laird custody of his children and instead ordered him to comply with services ordered as part of the dispositional plan.[9] Laird contends that this process—the one-parent doctrine at work—is forbidden by *Stanley*.

3.971. Rather than challenge the assumption of jurisdiction, Laird argues that the court's *exercise* of jurisdiction affecting *his* constitutional parental rights—that is, the one-parent doctrine at work—is an unconstitutional interference with those rights.

[9] To be clear, Laird's parental rights were not and have not been terminated. Nevertheless, temporary deprivation of custody is an "intrusion into the family sphere," *Hunter v Hunter*, 484 Mich 247, 269; 771 NW2d 694 (2009), and plainly infringes on Laird's constitutional rights as a parent, see *Troxel*, 530 US at 68 (opinion by O'Connor, J.) (recognizing that parental rights are implicated in grandparent-visitation cases).

14

The DHS responds that Laird was afforded all the process that he was due by virtue of the dispositional proceedings. According to the DHS, the dispositional phase obviates an unadjudicated parent's right to a fitness hearing.

As the Court of Appeals explained in *CR*, its interpretation of MCR 3.973(A) permits the trial court to enter dispositional orders affecting the rights of "any adult," including the parental rights of unadjudicated parents, as long as the court has established jurisdiction over the child. *CR*, 250 Mich App at 202-203. Because we have a duty to interpret statutes and court rules as being constitutional whenever possible, we reject any interpretation of MCL 712A.6 and MCR 3.973(A) that fails to recognize the unique constitutional protections that must be afforded to unadjudicated parents, irrespective of the fact that they meet the definition of "any adult."[10]

*Stanley* is plain that Laird's right to direct the care, custody, and control of his children is a fundamental right that cannot be infringed without *some* type of fitness hearing. We therefore begin our analysis by testing the DHS's contention that a dispositional hearing is a constitutionally sufficient process in light of the *Eldridge* factors. We conclude that under *Eldridge*, dispositional hearings are constitutionally

---

[10] MCR 3.973(A) states that, at a dispositional hearing, the court determines what measures it will take regarding the child "and, when applicable, against any adult, once the court has determined following trial, plea of admission, or plea of no contest that one or more of the statutory grounds alleged in the petition are true." While the parties have focused on the constitutional implications of interpreting the phrase "any adult" as the Court of Appeals did in *CR*, 250 Mich App at 202-203, we note that the phrase "when applicable" can reasonably—and constitutionally—be interpreted to mean that when the person meeting the definition of "any adult" is a presumptively fit parent, the court's authority during the dispositional phase is limited by the fact that the state must overcome the presumption of parental fitness by proving the allegations in the petition.

15

inadequate; due process requires that every parent receive an adjudication hearing before the state can interfere with his or her parental rights.

First, the importance of the private interest at stake here—a parent's fundamental right to direct the care, custody, and control of his or her child free from governmental interference—cannot be understated.[11] It is a core liberty interest recognized by the Fourteenth Amendment. "Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky*, 455 US at 753.

With respect to the second and third *Eldridge* factors, it is undisputed that the state has a legitimate and important interest in protecting the health and safety of minors and, in some circumstances, that the interest will require temporarily placing a child with a nonparent. *Stanley*, 405 US at 652. It is this interest that lies at the heart of the state's *parens patriae* power. But this interest runs parallel with the state's interest in maintaining the integrity of the family unit whenever possible. MCL 712A.1(3) ("This chapter shall be liberally construed so that each juvenile coming within the court's jurisdiction receives the care, guidance, and control, *preferably in his or her own home*,

_____

[11] We agree with the dissent that there is, of course, a second private interest that is always relevant in child protective proceedings—the child's interest in his or her own welfare. If a parent is unfit, the child's interest aligns with the state's *parens patriae* interest. On the other hand, the child *also* has an interest in remaining in his or her natural family environment. In which direction the child's interest preponderates cannot be known without first a specific adjudication of a parent's unfitness, as "the State cannot presume that a child and his parents are adversaries." *Santosky*, 455 US at 760. Rather, only "[a]fter the State has established parental unfitness . . . [may] the court . . . assume at the *dispositional* stage that the interests of the child and the natural parents do diverge." *Id*.

16

conducive to the juvenile's welfare and the best interest of the state.") (emphasis added); *Stanley*, 405 US at 652-653 ("[I]f Stanley is a fit father, the State spites its own articulated goals when it needlessly separates him from his family."); *Troxel*, 530 US at 68-69 (opinion by O'Connor, J.) ("[S]o long as a parent adequately cares for . . . [his or her] children, there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of [his or her] children."); *Santosky*, 455 US at 766-767 ("[W]hile there is still reason to believe that positive, nurturing parent-child relationships exist, the *parens patriae* interest favors preservation, not severance, of natural familial bonds."). When a child is parented by a fit parent, the state's interest in the child's welfare is perfectly aligned with the parent's liberty interest. But when a father or mother is erroneously deprived of his or her fundamental right to parent a child, the state's interest is undermined as well: "[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents." *Stanley*, 405 US at 652. In other words, the state ordinarily[12] has an equally strong interest in ensuring that a parent's

---

[12] Of course, when a minor faces an *imminent* threat of harm, the state's interest in the welfare of the child is paramount. In the case of an imminent threat of harm, the state may take the child into custody without prior court authorization or parental consent. See, e.g., *Tenenbaum v Williams*, 193 F3d 581, 593-594 (CA 2, 1999). And as noted in footnote 3 of this opinion, Michigan law allows exactly that process. See MCL 712A.14a(1); MCL 712A.14b(1)(a). Requiring an imminent threat of harm for removal is constitutionally sound: as the Second Circuit recognized in *Tenenbaum*, " '[T]he mere "possibility" of danger is not enough.' " *Tenenbaum*, 193 F3d at 594 (citation omitted; alteration in original). Similarly, upon the authorization of a child protective petition, the trial court may order *temporary* placement of the child into foster care pending adjudication if the court finds that placement in the family home would be contrary to the welfare of the child. MCR 3.965(B)(12)(b) and (C). Because our holding only reaches the court's exercise of its postadjudication dispositional authority, it should not be

17

fitness, or lack thereof, is resolved before the state interferes with the parent-child relationship. Thus, the probable value of extending the right to an adjudication to each parent in a child protective proceeding benefits both public and private interests alike.

There is no doubt that requiring adjudication of each parent will increase the burden on the state in many cases. But there is also little doubt that an adjudication would significantly reduce any risk of a parent's erroneous deprivation of the parent's right to parent his or her children. The trial is the only fact-finding phase regarding parental fitness, and the procedures afforded respondent parents are tied to the allegations of unfitness contained in the petition. As this Court has stated, "The procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation" of their parental rights. *Brock*, 442 Mich at 111.[13]

Dispositional hearings simply do not serve this same function. At the dispositional phase, the court is concerned only with what services and requirements will be in the best interests of the children. There is no presumption of fitness in favor of the unadjudicated parent.[14] See MCL 712A.18f. The procedures afforded parents during the

interpreted as preventing courts from ordering temporary foster-care placement pursuant to MCR 3.965(B)(12)(b) and (C).

[13] The risk of error is not limited to the erroneous interference with a parent's right to parent. Often times, pursuant to the one-parent doctrine, services will be ordered for the unadjudicated parent. Absent some fact-finding regarding that parent's alleged neglectful or abusive conduct, however, the DHS cannot reasonably be expected to formulate an individualized plan, resulting in unadjudicated parents being ordered to comply with potentially unnecessary and costly service plans.

[14] Ideally, the removal of the child at the dispositional hearing would always involve a finding that the child's parents are unfit, as the dissent suggests. The statutes and court rules governing the dispositional phase, however, simply do not demand any fitness

dispositional phase are *not* related to the allegations of unfitness because the question a court is answering at a dispositional hearing assumes a previous finding of parental unfitness.

While extending the right to an adjudication[15] to all parents before depriving them of the right to direct the care, custody, and control of their children will impose additional burdens on the DHS, those burdens do not outweigh the risks associated with depriving a parent of that right without any determination that he or she is unfit, as the one-parent doctrine allows. Thus, consideration of the procedures afforded parents at the dispositional phase in light of the *Eldridge* factors requires us to reject the DHS's primary argument.

---

determination. And because the "[t]he court may order compliance with all or part of the case service plan and may enter such orders as it considers necessary in the interest of the child," MCR 3.973(F)(2), the one-parent doctrine results in the unadjudicated parent's rights being subordinated to the court's best-interest determination.

[15] The dissent suggests that we have found a constitutional right to a jury trial in child protective proceedings. This misunderstands our opinion, as we have found no such constitutional right. Rather, we simply hold that due process requires a specific adjudication of a parent's unfitness and that the one-parent doctrine is unconstitutional because it deprives unadjudicated parents of this right. The right to a jury is granted by statute. MCL 712A.17(2) ("Except as otherwise provided in this subsection, in a hearing other than a criminal trial under this chapter, a person interested in the hearing may demand a jury of 6 individuals, or the court, on its own motion, may order a jury of 6 individuals to try the case."). Because Laird is *constitutionally* entitled to a fitness hearing, MCL 712A.17(2) affords him the *statutory* right to demand a jury because a parental-fitness hearing qualifies as a noncriminal hearing under the juvenile code.

We express no opinion about whether the jury guarantee in MCL 712A.17(2) is constitutionally required.

19

We also find unpersuasive the DHS's position that adjudication of one parent offers sufficient process to the other parent. An unadjudicated parent is not entitled to contest any allegations made against him or her at the other parent's adjudication hearing because the unadjudicated parent is not a party to that proceeding. While an unadjudicated parent can hope that the respondent parent is willing to vigorously contest the allegations made in the petition, as the facts here demonstrate, the unadjudicated parent will often be disappointed. The respondent parent may enter a plea, as is his or her right, or may choose not to defend the allegations as vigorously as the unadjudicated parent would prefer. Moreover, as a nonparty to those proceedings, it is difficult to see how an unadjudicated parent could have standing to appeal any unfavorable ruling.

We find similarly unconvincing the argument that the state is relieved of its initial adjudication burden because unadjudicated parents *may* have the opportunity to have their parental rights restored during the dispositional phase, *if* the unadjudicated parents have complied with the case services plan or court orders, or both, during the dispositional phase.[16] The DHS's argument puts the plow before the mule. The possibility of a fix at the back end is not sufficient to justify a lack of process at the front

---

[16] For example, the trial court must order the child returned home at the permanency planning hearing unless the court determines that he or she is likely to be harmed if placed with the parent. MCL 712A.19a(1); MCR 3.976(E)(2). According to the dissent, a decision not to return the child to the parent's home necessarily entails a determination that the unadjudicated parent is unfit, thus ensuring that fit parents are not deprived of custody. What the dissent fails to recognize, however, is that there is no similar requirement during the earlier dispositional hearings, see MCR 3.975, and that the unadjudicated parent will have to wait up to a year after the child's removal before the permanency planning hearing takes place, see MCL 712A.19a(1); MCR 3.976(E)(2).

end.  Rather, the state must adjudicate a parent's fitness *before* interfering with his or her parental rights.  *Stanley*, 405 US at 658.  The arguments made by the DHS echo an argument the state of Illinois made in *Stanley*: because Stanley might have been able to regain custody of his children as a guardian or through adoption proceedings, no harm was done. *Id*. at 647.  The Court disagreed:

> This Court has not . . . embraced the general proposition that a wrong may be done if it can be undone.  Surely, in the case before us, if there is a delay between the doing and the undoing [Stanley] suffers from the deprivation of his children, and the children suffer from uncertainty and dislocation. [*Id*. (citation omitted).]

The same is true here. The state cannot deprive an unadjudicated parent of his or her constitutional parental rights simply because those rights may be restored at some future date.  The Constitution demands more.[17]

### B.  MOOTNESS

Finally, we decline the DHS's invitation to dismiss this case as moot because Laird is currently incarcerated for violating federal drug-trafficking laws.   An incarcerated parent *can* exercise the constitutional right to direct the care of his or her children while incarcerated, and Laird has tried to do just that.[18]   For example, an

---

[17] Because we hold that the one-parent doctrine violates the due process rights of unadjudicated parents, we need not consider Laird's argument that the doctrine also violates the Equal Protection Clause.

[18] See, e.g., *In re Weldon*, 397 Mich 225, 296; 244 NW2d 827 (1976) ("Some parents, however, because of illness, incarceration, employment or other reason, entrust the care of their children for extended periods of time to others.  This they may do without interference by the state as long as the child is adequately cared for.") (opinion by LEVIN, J.), overruled in part on other grounds by *Bowie v Arder*, 441 Mich 23, 47; 490 NW2d 568 (1992); *In re Curry*, 113 Mich App 821, 826-827; 318 NW2d 567 (1982) ("Until

21

incarcerated parent can choose who will care for his children while he is imprisoned. *In re Mason*, 486 Mich at 161 n 11 ("Michigan traditionally permits a parent to achieve proper care and custody through placement with a relative."). At several times during the proceedings below, Laird requested that the children be placed with his mother, the children's parental grandmother. As long as the children are provided adequate care, state interference with such decisions is not warranted. As a result, Laird's complaint is not moot.

## IV. CONCLUSION

We recognize that the state has a legitimate—and crucial—interest in protecting the health and safety of minor children. That interest must be balanced, however, against the fundamental rights of parents to parent their children. Often, these considerations are not in conflict because "there is a presumption that fit parents act in the best interests of their children." *Troxel*, 530 US at 68 (opinion by O'Connor, J.). When the state is concerned that *neither* parent should be entrusted with the care and custody of their children, the state has the authority—and the responsibility—to protect the children's safety and well-being by seeking an adjudication against *both* parents. In contrast, when the state seeks only to deprive *one* parent of the right to care, custody and control, the state is only required to adjudicate *that* parent. In this case, for example, there was no

---

there is a demonstration that the person entrusted with the care of the child by that child's parent is either unwilling or incapable of providing for the health, maintenance, and well being of the child, the state should be unwilling to interfere.").

constitutional or jurisdictional impediment to disrupting the parental rights of Sanders, who was afforded the right to a determination of fitness.

Adjudication protects the parents' fundamental right to direct the care, custody, and control of their children, while also ensuring that the state can protect the health and safety of the children. Admittedly, in some cases this process may impose a greater burden on the state than would application of the one-parent doctrine because "[p]rocedure by presumption is always cheaper and easier than individualized determination." *Stanley*, 405 US at 656-657. But as the United States Supreme Court made clear in *Eldridge*, constitutional rights do not always come cheap. The Constitution does not permit the state to presume rather than prove a parent's unfitness "solely because it is more convenient to presume than to prove." *Stanley*, 405 US at 658.

We accordingly hold that due process requires a specific adjudication of a parent's unfitness before the state can infringe the constitutionally protected parent-child relationship. In doing so, we announce no new constitutional right. Rather, we affirm that an old constitutional right—a parent's right to control the care, custody, and control of his or her children—applies to *everyone*, which is the very nature of constitutional rights. Because the one-parent doctrine allows the court to deprive a parent of this fundamental right without any finding that he or she is unfit, it is an unconstitutional violation of the Due Process Clause of the Fourteenth Amendment. We therefore overrule

23

*In re CR*, vacate the order of the trial court, and remand this case to the trial court for further proceedings consistent with this opinion.

Bridget M. McCormack
Robert P. Young
Michael F. Cavanagh
Mary Beth Kelly
Brian K. Zahra

24

STATE OF MICHIGAN

SUPREME COURT

_____

*In re* SANDERS, Minors.

_____

DEPARTMENT OF HUMAN SERVICES,

       Petitioner-Appellee,

v

LANCE LAIRD,

       Respondent-Father-Appellant,

and

TAMMY SANDERS,

       Respondent-Mother.

No. 146680

_____

MARKMAN, J. (*dissenting*).

      The issue here, as it generally is in constitutional cases, is whether the Legislature has acted in an unconstitutional manner by enacting statutes that for many years have provided the underpinnings for the so-called one-parent doctrine.[1] I do not believe that it

_____

[1] Even this threshold statement of the constitutional issue in this case separates the majority opinion and this opinion. The majority opinion concentrates almost exclusively on the Court of Appeals' decision in *In re CR*, 250 Mich App 185; 646 NW2d 506 (2002), and gives little attention to connecting this analysis to the statutes and court rules that underlie *CR*.

has. For that reason, I respectfully dissent from the majority opinion's decision to vacate the order of the trial court, overrule *In re CR*, 250 Mich App 185; 646 NW2d 506 (2002), and hold that the one-parent doctrine, which has been a part of our statutory scheme for more than 70 years, is now unconstitutional under the Due Process Clause of the Fourteenth Amendment. Instead, I would affirm the trial court and conclude that *CR* correctly held that the one-parent doctrine, as well as the statutes and court rules on which the doctrine is grounded, remain constitutional. The Legislature has adequately protected the due process rights of a parent of an abused or neglected child (a child whose other parent has already been adjudicated unfit) by requiring a hearing on the parent's fitness before the state can interfere with this parent's parental rights, and appellant here has been reasonably determined to be unfit after several such hearings.

## I. FACTS AND HISTORY

Appellant Lance Laird and Tammy Sanders were never married, but are the parents of two young boys-- P (born in 2010) and C (born in 2011). Soon after the youngest boy was born with drugs in his system, the DHS removed the child from Sanders's custody and placed him with Laird, where the other child was already living.[2] However, a few weeks later when Laird himself tested positive for cocaine, the DHS removed the children from his custody and placed them with their paternal aunt. Sanders entered a no-contest plea to allegations of abuse and neglect. The trial court applied the one-parent doctrine to continue the children's placement with their aunt and order Laird to comply with a service plan, including psychological evaluation, parenting classes,

---

[2] Laird and the children lived with Laird's mother.

2

substance abuse assessment, random drug screens, maintenance of housing and employment, and terms of probation stemming from a previous domestic violence conviction.

Laird filed a motion seeking immediate placement of his children with him and challenging the one-parent doctrine. Following a hearing at which several witnesses, including Laird himself, testified, the trial court, relying on *CR*, denied this motion, and the Court of Appeals denied leave to appeal for lack of merit. *In re Sanders Minors*, unpublished order of the Court of Appeals, entered January 18, 2013 (Docket No. 313385). This Court granted leave to appeal and directed the parties to address "whether the application of the one-parent doctrine violates the due process or equal protection rights of unadjudicated parents." *In re Sanders*, 493 Mich 959 (2013).

## II. STANDARD OF REVIEW

Questions involving the interpretation of statutes and court rules are reviewed de novo. *People v Buie*, 491 Mich 294, 304; 817 NW2d 33 (2012). Questions of constitutional law are also reviewed de novo. *Id.* It is well established that

> "[s]tatutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v Gate Pharm*, 468 Mich 1, 6; 658 NW2d 127 (2003). "We exercise the power to declare a law unconstitutional with extreme caution, and we never exercise it where serious doubt exists with regard to the conflict." *Phillips v Mirac, Inc*, 470 Mich 415, 422; 685 NW2d 174 (2004). " 'Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity.' " *Id.* at 423, quoting *Cady v Detroit*, 289 Mich 499, 505; 286 NW 805 (1939). Therefore, "the burden of proving that a statute is unconstitutional rests with the party challenging it," *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1,

3

11; 740 NW2d 444 (2007) . . . . "[W]hen considering a claim that a statute is unconstitutional, the Court does not inquire into the wisdom of the legislation." *Taylor*, 468 Mich at 6. [*In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 307-308; 806 NW2d 683 (2011) (second alteration in original).]

"[W]e interpret court rules using the 'same principles that govern the interpretation of statutes,' " *Buie*, 491 Mich at 304, and therefore court rules, like statutes, are presumed to be constitutional.[3] (Citation omitted.)

## III. ANALYSIS

## A. THE ONE-PARENT DOCTRINE

Child-protective proceedings typically begin with the state filing a petition in the trial court alleging that a parent has abused or neglected a child. MCL 712A.13a(2); MCR 3.961. Then comes the adjudicative phase, in which it is determined whether the parent abused or neglected the child as alleged in the petition and thus whether the court has jurisdiction over the child. During this adjudicative phase, a parent can admit the allegations, plead no contest to the allegations, or demand a trial. MCR 3.971; MCR 3.972. Once a parent has admitted the allegations or pleaded no contest, or the fact-finder

---

[3] The majority opinion makes only the most perfunctory reference to its threshold obligation to presume the constitutionality of statutes and court rules. Rather, it begins its analysis by presuming that the one-parent doctrine-- a doctrine derived from both our statutes and court rules-- is unconstitutional, as suggested by its initial observation that "[m]erely describing the doctrine foreshadows its constitutional weakness." The opinion treats the one-parent doctrine as if it had been created by the Court of Appeals out of whole cloth. *Ante* at 2. ("[T]he [trial] court relied on the one-parent doctrine and the Court of Appeals' decision in *In re CR*, 250 Mich App 185; 646 NW2d 506 (2002), from which that doctrine derives."). Nowhere, including in its ultimate holding, does the majority opinion give serious recognition to the fact that the one-parent doctrine is derived from statutes and court rules of this state, which explains in turn why it also gives little recognition to the fact that these must be presumed constitutional. The positive law of this state is largely a bystander in the majority opinion.

4

has found "evidence of abuse [or] neglect proved by a preponderance of the legally admissible evidence presented at the adjudication, [the court has jurisdiction over the child, and] it then proceeds to the dispositional phase of the protective proceedings." *CR*, 250 Mich App at 200-201. During the dispositional phase, the court will "determine what measures [it] will take with respect to a child," MCR 3.973(A), and in doing so, the court "may make orders affecting adults as in the opinion of the court are necessary for the physical, mental, or moral well-being of [the child] under its jurisdiction," MCL 712A.6. As this Court explained in *In re Brock*, 442 Mich 101, 108; 499 NW2d 752 (1993):

> Child protective proceedings are generally divided into two phases: the adjudicative and the dispositional. The adjudicative phase determines whether the . . . court may exercise jurisdiction over the child. If the court acquires jurisdiction, the dispositional phase determines what action, if any, will be taken on behalf of the child.

The so-called one-parent doctrine allows a trial court to exercise jurisdiction over a child on the basis of the adjudication of only one parent. In other words, after one parent has been adjudicated, the court does not have to adjudicate the other parent, but instead can proceed to the dispositional phase. It is undisputed that the Legislature incorporated the one-parent doctrine into its statutory scheme and that this Court similarly incorporated the doctrine into its court rules. Most notably, MCL 712A.2 provides, in pertinent part:

> The court has the following authority and jurisdiction:
>
> *   *   *
>
> (b) Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:

5

(1) Whose *parent* or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . . .

* * *

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of *a parent*, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. [Emphasis added.][4]

MCL 712A.2(b) employs the singular form of "parent" and thus does not require that both parents be adjudicated in order for the court to exercise jurisdiction over the child.[5]

In addition, MCL 712A.6 provides:

---

[4] Indeed, the Legislature incorporated the one-parent doctrine into its statutory scheme as early as 1944 when it added Chapter XIIA to the Probate Code, now codified at MCL 712A.1 *et seq*. See 1944 (Ex Sess) PA 54, § 2(a)(6) (granting jurisdiction to the court over any child under 17 years of age "[w]hose *parent* or other person legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses, to provide proper or necessary support, education as required by law, medical, surgical or other care necessary for his health, morals or well-being, or who is abandoned by his parents, guardian, or other custodian, or who is otherwise without proper custody or guardianship") (emphasis added).

[5] The majority opinion agrees that the fact that "MCL 712A.2(b)(1) refers singularly to 'parent' . . . is consistent with the *unremarkable* idea that courts may assume jurisdiction over a child on the basis of the adjudication of one parent." *Ante* at 13 n 8 (emphasis added); see also *ante* at 9 ("[O]nce there has been *an* adjudication, either by trial or by plea, the court has jurisdiction over the child regardless of whether one or both parents have been adjudicated unfit."). However, this assumption of jurisdiction over the child is not quite as "unremarkable" as the majority opinion seems to believe, at least for purposes of the instant case, since MCL 712A.6 provides that once the court has jurisdiction over the child, it *also* "has jurisdiction over adults . . . and may make orders affecting adults as in the opinion of the court are necessary for the physical, mental, or

6

> The court has jurisdiction *over adults* as provided in this chapter and as provided in chapter 10A of the revised judicature act of 1961, 1961 PA 236, MCL 600.1060 to 600.1082, and may make orders *affecting adults* as in the opinion of the court are necessary for the physical, mental, or moral well-being of a particular juvenile or juveniles under its jurisdiction. However, those orders shall be incidental to the jurisdiction of the court over the juvenile or juveniles.  [Emphasis added.]

Accordingly, once the court adjudicates one *parent*, pursuant to MCL 712A.2(b) the court can exercise jurisdiction over the *child* and, pursuant to MCL 712A.6, in exercising that jurisdiction, the court can "make orders affecting adults as in the opinion of the court are necessary for the physical, mental, or moral well-being" of the child.  This makes sense because if a child is being abused or neglected, it is imperative that a court have the power to immediately intervene and to intervene effectively.  "[A] juvenile court must be afforded the flexibility to assume jurisdiction over a child based on findings of maltreatment against one parent.  This authority is essential to ensuring that the court has the ability to issue orders to remedy the abuse or neglect by the offending parent." Sankaran, *Parens Patriae Run Amuck: The Child Welfare System's Disregard for the Constitutional Rights of Nonoffending Parents*, 82 Temp L Rev 55, 84 (2009).

The one-parent doctrine has similarly been incorporated into the Michigan Court Rules.  For example, MCR 3.973(A) provides:

> A dispositional hearing is conducted to determine what measures the court will take with respect to a child properly within its jurisdiction and, when applicable,[6] *against any adult,*[7] once the court has determined

---

moral well-being of a particular juvenile or juveniles under its jurisdiction."  "Adults" presumably includes the *parents* of the child over whom jurisdiction has been assumed.

[6] The majority opinion contends that

following trial, plea of admission, or plea of no contest that one or more of the statutory grounds alleged in the petition are true.  [Emphasis added.]

In addition, MCR 3.973(F)(2) provides:

> The court shall not enter an order of disposition until it has examined the case service plan as provided in MCL 712A.18f.  The court may order compliance with all or part of the case service plan and may enter such orders as it considers necessary in the interest of the child.

Accordingly, as the Court of Appeals explained in *CR*, 250 Mich App at 202-203, 205:

> [O]nce the family court acquires jurisdiction over the children, MCR [3.973(A)] authorizes the family court to hold a dispositional hearing "to determine [what] measures [the court will] take[] . . . *against any adult* . . . ."  MCR [3.973(F)(2)] then allows the family court to "order compliance with all or part of the case service plan and *may enter such orders as it considers necessary in the interest of the child*."  Consequently, after the family court found that the children involved in this case came within its jurisdiction on the basis of [the adjudicated parent's] no-contest

---

the phrase "when applicable" [in MCR 3.973(A)] can reasonably—and constitutionally—be interpreted to mean that when the person meeting the definition of "any adult" is a presumptively fit parent, the court's authority during the dispositional phase is limited by the fact that the state must overcome the presumption of parental fitness by proving the allegations in the petition.

While I agree that the state must certainly overcome the presumption of parental fitness, I do not believe that the state must do this by "proving the allegations in the petition." Instead, as discussed more fully later, the state can overcome the presumption by proving that the parent abused or neglected the child regardless of whether such allegations were contained in the petition.  I do not believe that the language "when applicable" suggests anything to the contrary.  However, even if it did, the pertinent statute, MCL 712A.6, indisputably cannot be interpreted in this way because it does not contain the phrase "when applicable" and it very clearly states that "[t]he court has jurisdiction over adults . . . and may make orders affecting adults as in the opinion of the court are necessary for the physical, mental, or moral well-being of a particular juvenile or juveniles under its jurisdiction."

[7] We do not have to decide in this case the breadth of the language "any adult" because no one disputes that it applies to Laird.

8

plea and supporting testimony at the adjudication, the family court was able to order [the unadjudicated parent] to submit to drug testing and to comply with other conditions necessary to ensure that the children would be safe with him even though he was not a respondent in the proceedings. This process eliminated the [petitioner's] obligation to allege and demonstrate by a preponderance of legally admissible evidence that [the unadjudicated parent] was abusive or neglectful within the meaning of MCL 712A.2(b) before the family court could enter a dispositional order that would control or affect his conduct. . . .

* * *

As we have explained, the court rules simply do not place a burden on a petitioner . . . to file a petition and sustain the burden of proof at an adjudication with respect to every parent of the children involved in a protective proceeding before the family court can act in its dispositional capacity. The family court's jurisdiction is tied to the children, making it possible, under the proper circumstances, to terminate parental rights even of a parent who, for one reason or another, has not participated in the protective proceeding. [Some emphasis omitted.][8]

---

[8] The majority opinion "reject[s]" the Court of Appeals' interpretation of MCL 712A.6 because its interpretation "would seemingly grant trial courts unfettered authority to enter dispositional orders . . . ." *Ante* at 13-14. I do not believe that MCL 712A.6, or the Court of Appeals' interpretation of it, grants courts any such authority. Rather, it grants courts the far more limited power to "make orders affecting adults as in the opinion of the court are *necessary* for the physical, mental, or moral well-being of a particular juvenile or juveniles under its jurisdiction." MCL 712A.6 (emphasis added). Contrary to the majority opinion's contention, such an order can in no way be said to "impermissibly interfere[] with a parent's constitutional right to direct the care and custody of his or her child," *ante* at 14, as a parent's constitutional rights with respect to his or her child have never been regarded as absolute, in particular not with regard to abusive and neglectful parents, *Stanley v Illinois*, 405 US 645, 652; 92 S Ct 1208; 31 L Ed 2d 551 (1972) ("Neglectful parents may be separated from their children."). As discussed in more detail later, it would never be "necessary" to enter an order that infringes on a parent's "rights" *unless* that parent has been determined to be unfit. Thus, in enacting MCL 712A.6, which only allows the court to enter orders that infringe on an unfit parent's "rights," the Legislature manifestly did not grant courts any "unfettered authority" to "impermissibly interfere[] with a parent's constitutional right[s] . . . ." *Ante* at 13-14.

9

Laird concedes and the majority opinion agrees that the court can exercise jurisdiction over a child on the basis of the adjudication of only one parent. Accordingly, Laird concedes and the majority opinion again agrees that the trial court had jurisdiction over the children at issue here because their mother had entered a no-contest plea to the allegations in the amended petition. See *ante* at 13 n 8 ("[T]he trial court properly assumed jurisdiction over the children based on Sanders's plea."). However, Laird argues and the majority opinion agrees that the court violated his due process rights by relying on the one-parent doctrine to enter an order taking away his children and directing him to comply with a service plan without first adjudicating him as unfit. Although the Court of Appeals has addressed this issue many times and has consistently held that the one-parent doctrine does not violate due process, this Court has not yet addressed the issue. See, e.g., *In re Slater/Weimer*, unpublished opinion of the Court of Appeals, issued March 25, 2014 (Docket No. 317132), p 2 (opinion by MARKEY, J.); *In re Farris*, unpublished opinion per curiam of the Court of Appeals, issued August 8, 2013 (Docket Nos. 311967, 312193, and 312194), pp 5-6;[9] *In re Mays*, unpublished opinion per curiam of the Court of Appeals, issued December 6, 2012 (Docket No. 309577), p 4 (*Mays II*);[10] *In re Rohmer*, unpublished opinion per curiam of the Court of Appeals, issued August 14, 2012 (Docket No. 308745), p 3; *In re Camp*, unpublished memorandum opinion of the

---

[9] This Court is currently holding an application for leave to appeal in *Farris* in abeyance pending the decision in this case. *In re Farris*, 838 NW2d 147 (Mich, 2013).

[10] In *In re Mays*, 493 Mich 945 (2013) (*Mays II*), this Court denied leave to appeal on the basis of mootness because the parents had reached a consent agreement regarding joint custody of the children.

10

Court of Appeals, issued May 9, 2006 (Docket No. 265301), lv den 476 Mich 853 (2006); *In re Church*, unpublished opinion per curiam of the Court of Appeals, issued April 11, 2006 (Docket Nos. 263541 and 265112), lv den 475 Mich 899 (2006).[11] This Court expressed an interest in addressing the constitutionality of the one-parent doctrine in *In re Mays*, 490 Mich 993, 994 n 1 (2012) (*Mays I*), stating:

> The constitutionality of the "one parent doctrine" is obviously a jurisprudentially significant issue and one which this Court will undoubtedly soon be required to address given the widespread application of this doctrine.

However, this Court did not address the issue in *Mays I* because the appellant-father had failed to preserve the issue in the trial court or the Court of Appeals. *Id.*

## B. DUE PROCESS

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law[.]" US Const, Am XIV, § 1. "It is well established that parents have a significant interest in the companionship, care, custody, and management of their children," and "[t]his interest has been characterized as an element of 'liberty' to be protected by due process." *Brock*, 442 Mich at 109. Indeed, "[t]he liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v Granville*, 530 US 57, 65; 120 S Ct 2054; 147 L Ed

---

[11] "Nearly every state" has adopted the one-parent doctrine, Sankaran, 82 Temp L Rev at 57, and this "near-universal approach," *id.*, has been upheld against similar constitutional challenges in other states. See, for example, *In re AR*, 330 SW3d 858 (Mo App, 2011); *In re CR*, 108 Ohio St 3d 369; 843 NE2d 1188 (2006); *In re Amber G*, 250 Neb 973; 554 NW2d 142 (1996).

11

2d 49 (2000) (opinion by O'Connor, J.).[12]  And this interest "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."  *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982).

"Where procedural due process must be afforded because a 'liberty' or 'property' interest is within the Fourteenth Amendment's protection, there must be determined 'what process is due' in the particular context."  *Smith v Org of Foster Families for Equality & Reform*, 431 US 816, 847; 97 S Ct 2094; 53 L Ed 2d 14 (1977).  " ' "[D]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' "  *Mathews v Eldridge*, 424 US 319, 334; 96 S Ct 893; 47 L Ed 2d 18 (1976), quoting *Cafeteria & Restaurant Workers Union v McElroy*, 367 US 886, 895; 81 S Ct 1743; 6 L Ed 2d 1230 (1961).  Instead, " '[d]ue process is flexible and calls for such procedural protections as the particular situation demands.' "  *Smith*, 431 US at 848, quoting *Morrissey v Brewer*, 408 US 471, 481; 92 S Ct 2593; 33 L Ed 2d 484 (1972).  " '[T]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation' . . . ."  *Stanley v Illinois*, 405 US 645, 650; 92 S Ct 1208; 31 L Ed 2d 551 (1972), quoting *Cafeteria Workers*, 367 US at 895.  "It is true that '[b]efore a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, "except for extraordinary situations where some valid governmental interest is at stake that

---

[12]  In *Troxel*, 530 US at 72-73 (opinion by O'Connor, J.), the Court held that Washington's nonparental visitation statute was unconstitutional because it "infringe[d] on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made."

justifies postponing the hearing until after the event." ' " *Smith*, 431 US at 848, quoting

*Bd of Regents of State Colleges v Roth*, 408 US 564, 570 n 7; 92 S Ct 2701; 33 L Ed 2d

548 (1972) (citation omitted). "But the hearing required is only one 'appropriate to the

nature of the case.' " *Smith*, 431 US at 848, quoting *Mullane v Central Hanover Bank &

Trust Co*, 339 US 306, 313; 70 S Ct 652; 94 L Ed 865 (1950). The following factors

should generally be considered when determining "what process is due":

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [*Mathews*, 424 US at 335.]

### C. THE ONE-PARENT DOCTRINE AND DUE PROCESS

### 1. PRIVATE INTEREST

The first factor to be considered is "the private interest that will be affected by the

official action[.]" *Id*. "The private interest here, that of a man in the children he has sired

and raised, undeniably warrants deference and, absent a powerful countervailing interest,

protection." *Stanley*, 405 US at 651. "It is plain that the interest of a parent in the

companionship, care, custody, and management of his or her children 'come[s] to this

Court with a momentum for respect lacking when appeal is made to liberties which

derive merely from shifting economic arrangements.' " *Id*., quoting *Kovacs v Cooper*,

336 US 77, 95; 69 S Ct 448; 93 L Ed 513 (1949) (Frankfurter, J., concurring) (alteration

in original). "[T]here is a presumption that fit parents act in the best interests of their

children." *Troxel*, 530 US at 68 (opinion by O'Connor, J.). "Accordingly, so long as a

parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no

13

reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id*. at 68-69.

## 2. THE RISK OF ERRONEOUS DEPRIVATION OF AN INTEREST

The next factor to be considered is "the risk of an erroneous deprivation of such interest through the procedures used . . . ." *Mathews*, 424 US at 335. "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be condemned to suffer grievous loss." *Santosky*, 455 US at 758 (citations and quotation marks omitted).[13] "[T]he degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity of any administrative decisionmaking process." *Mathews*, 424 US at 341. " '[T]he possible length of wrongful deprivation of . . . benefits [also] is an important factor in assessing the impact of official action on the private interests.' " *Id*. (citation omitted) (alteration in original).

With regard to this factor, it is important to remember that the issue we address in the instant case concerns the propriety of a parent of an abused or neglected child (a child whose other parent has already been adjudicated as unfit) being deprived of the adjudicative phase of a child-protective proceeding. We are not addressing a criminal proceeding, and we are not addressing a termination-of-parental-rights proceeding. "Child protective proceedings are not criminal proceedings." *Brock*, 442 Mich at 107.

---

[13] In *Santosky*, 455 US at 768-769, the Court held that while applying a "fair preponderance of the evidence" standard in a parental-rights termination proceeding does not satisfy due process, applying a "clear and convincing evidence" standard does.

"The purpose of child protective proceedings is the protection of the child . . . ." *Id*. "The juvenile code is intended to protect children from unfit homes rather than to punish their parents." *Id*. at 108. The adjudicative phase only determines whether the trial court has jurisdiction over the child. In *Brock*, 442 Mich at 115, this Court described the adjudicative phase as the "initial phase wherein the court acquires jurisdiction in order to attempt to alleviate the problems in the home so that the children and the parents can be reunited . . . ."

The degree of interference with the parent's rights over the child after a finding that jurisdiction exists is largely dependent on the circumstances. As this Court has recognized, "[u]pon a finding of jurisdiction, the [family] court has several options, one of which is to return the children to their parents. Not every adjudicative hearing results in removal of custody." *Id*. at 111.[14] Simply put, a finding of jurisdiction does not necessarily, or immediately, foreclose the parent's rights to his or her child. "Moreover, in order to permanently terminate respondents' parental rights, further hearings would be required, and the statutory elements for termination must be proven by clear and convincing evidence." *Id*. at 111-112.

"[T]he fairness and reliability of the existing . . . procedures" must also be considered. *Mathews*, 424 US at 343. As the Court of Appeals explained in *Mays II*, unpub op at 3-5:

> The procedures outlined by the Juvenile Code and the court rules protect a parent's due process rights. They permit the court to issue an order to take a child into custody when a judge or referee finds from the

---

[14] In *Brock*, 442 Mich at 110, this Court held that due process does not require that a parent be given the opportunity to cross-examine the child during the adjudicative phase.

evidence "reasonable grounds to believe that conditions or surroundings under which the child is found are such as would endanger the health, safety, or welfare of the child and that remaining in the home would be contrary to the welfare of the child." MCR 3.963(B)(1). Once the child is taken into custody, the parent must be notified and advised "of the date, time, and place of the preliminary hearing," which is to be held within 24 hours after the child has been taken into custody, and a petition is to be prepared and submitted to the court. MCR 3.921(B)(1); MCR 3.963(C); MCR 3.965(A)(1). If the child is in protective custody when the petition is filed, the procedures afforded at the preliminary hearing provide due process to the respondent-parents. They are informed of the charges against them and the court may either release the child to the respondent-parents or order alternative placement. MCR 3.965(B)(4) and (12)(b). Before ordering alternative placement, "the court shall receive evidence, unless waived, to establish that the criteria for placement . . . are present. The respondent shall be given an opportunity to cross-examine witnesses, subpoena witnesses, and to offer proof to counter the admitted evidence." MCR 3.965(C)(1). Thus, the respondent-parents are given notice of the proceedings and an opportunity to be heard before the child can remain in protective custody.

For the court to continue the child in alternative placement and "exercise its full jurisdiction authority," it must hold an adjudicatory hearing at which the factfinder determines whether the child comes within the provisions of [MCL 712A.2(b)]. . . . Once jurisdiction is obtained, the case proceeds to disposition "to determine what measures the court will take with respect to a child properly within its jurisdiction and, when applicable, against any adult . . . ." MCR 3.973(A).

* * *

The essence of respondent's argument on appeal is that the one parent doctrine violates the nonadjudicated parent's due process rights by depriving him of custody of his children without a determination that he is an unfit custodian, as would be established at the adjudicatory hearing. Respondent's argument conflates the adjudicatory and dispositional phases of the proceedings. The adjudicatory phase determines whether a child requires the protection of the court because he or she comes within the parameters of [MCL 712A.2(b)]. If the child comes within the scope of [MCL 712A.2(b)], the trial court acquires jurisdiction and "can act in its dispositional capacity." It is at the dispositional hearing that the court determines "what measures [it] will take with respect to a child properly within its jurisdiction[.]" MCR 3.973(A). It can issue a warning to the

16

parents and dismiss the petition, MCL 712A.18(1)(a), place the child in the home of a parent or a relative under court supervision, MCL 712A.18(1)(b), or commit the child to the DHS for placement, MCL 712A.18(1)(d) and (e). Before the court determines what action to take, the DHS must prepare a case service plan, MCL 712A.18f(2), and the court must "consider the case service plan and any written or oral information concerning the child from the child's parent, guardian, custodian, foster parent, child caring institution, relative with whom the child is placed, lawyer-guardian ad litem, attorney, or guardian ad litem; and any other evidence offered, including the appropriateness of parenting time, which information or evidence bears on the disposition." MCL 712A.18f(4). See, also, MCR 3.973(E)(2) and (F)(2). If the DHS recommends against placing the child with a parent, it must "report in writing what efforts were made to prevent removal, or to rectify conditions that caused removal, of the child from the home," MCR 3.973(E)(2), and identify the likely harm to the child if separated from or returned to the parent. MCL 712A.18f(1)(c) and (d). The parent is entitled to notice of the dispositional hearing, MCR 3.921(B)(1)(d), and the parties are entitled to an opportunity "to examine and controvert" any reports offered to the court and to "cross-examine individuals making the reports when those individuals are reasonably available." MCR 3.973(E)(3).

If the child is removed from the home and remains in alternative placement, the court must hold periodic review hearings to assess the parents' progress with services and the extent to which the child would be harmed if he or she remains separated from, or is returned to, the parents. MCL 712A.19(3) and (6); MCR 3.975(A) and (C). The court must "determine the continuing necessity and appropriateness of the child's placement" and may continue that placement, change the child's placement, or return the child to the parents. MCL 712A.19(8); MCR 3.975(G). Before making a decision, the court must "consider any written or oral information concerning the child from the child's parent, guardian, legal custodian, foster parent, child caring institution, or relative with whom a child is placed, in addition to any other relevant and material evidence at the hearing." MCR 3.975(E). If the child remains out of the home and parental rights have not been terminated, the court must hold a permanency planning hearing within 12 months from the time the child was removed from the home and at regular intervals thereafter. MCL 712A.19a(1); MCR 3.976(B)(2) and (3). The purpose of the hearing is to assess the child's status "and the progress being made toward the child's return home[.]" MCL 712A.19a(3). At the conclusion of the hearing, the court "must order the child returned home unless it determines that the return would cause a substantial risk of harm to the life, the physical health, or the mental well-

being of the child." MCR 3.976(E)(2). See, also, MCL 712A.19a(5). In making its determination, "[t]he court must consider any written or oral information concerning the child from the child's parent, guardian, legal custodian, foster parent, child caring institution, or relative with whom a child is placed, in addition to any other relevant and material evidence at the hearing." MCR 3.976(D)(2). Further, "[t]he parties must be afforded an opportunity to examine and controvert written reports received by the court and may be allowed to cross-examine individuals who made the reports when those individuals are reasonably available." *Id*. As with the initial dispositional hearing, each parent is entitled to notice of the dispositional review and permanency planning hearings and an opportunity to participate therein. MCR 3.920(B)(2)(c); MCR 3.975(B); MCR 3.976(C).[15]

*These provisions, taken together, satisfy the requirements of due process. The parent is entitled to notice of the dispositional hearing and an opportunity to be heard before the court makes its dispositional ruling. When it is recommended that the child not be placed with a parent, the court must consider whether the child is likely to be harmed if placed with the parent, which would necessarily entail a determination regarding that parent's fitness as a custodial parent.* Once the court determines that the child should not be placed with the parents, it may continue the child in alternative placement or return the child to the parents depending on the circumstances of the parents and the child, again considering whether the child is likely to be harmed if placed with the parent, which would necessarily entail a determination regarding that parent's fitness as a custodial parent. Respondent does not contend that these procedures were not followed here. [Emphasis added; alterations in original except those inserting citations.][16]

---

[15] As explained in *Camp*, unpub op at 2 n 1:

Respondent is additionally protected by the different standards of proof applicable at a dispositional hearing. "The parent who has been subject to an adjudication . . . can have [his or] her parental rights terminated on the basis of all the relevant and material evidence on the record, including evidence that is not legally admissible. In contrast, the petitioner must provide legally admissible evidence in order to terminate the rights of the parent who was not subject to an adjudication." [Citation omitted; alteration in original.]

[16] See also *Slater/Weimer*, unpub op at 3 (opinion by MARKEY, J.), which explained:

18

Given the protections afforded to parents by the provisions discussed above, "the risk of an erroneous deprivation" of a parent's interest, if any, is minimal.

As discussed more later, I believe that I reach a different result than the majority opinion partly because while the majority opinion only fleetingly acknowledges the interests of the children, I believe this to be the most important interest at issue here. The

---

> [R]espondent cannot establish an erroneous deprivation of her liberty interest in caring for her children because before the trial court is authorized to take further action after adjudication, a respondent is entitled to receive additional procedural safeguards during the dispositional phase of the proceedings. For instance, and contrary to respondent's claims, the adjudication phase of the proceedings does not require the trial court to remove a child from the parent's home. See MCL 712A.18(1)(a), (b). And, during the dispositional phase of the proceedings, if petitioner recommends against placing the child with her parent, petitioner "shall report in writing what efforts were made to prevent removal, or to rectify conditions that caused removal, of the children from the home." MCR 3.973(E)(2). *Hence, the subsequent removal of a child from her parent's home during the dispositional phase involves a finding that the parent is unfit.* Further, before respondent's parental rights can be terminated, she is entitled to a number of additional procedural protections during the dispositional phase of the proceedings, such as dispositional review hearings, the implementation of a case services plan, parental visitation, and findings as to whether continued placement outside of the home is necessary to protect the children. *In re CR*, 250 Mich App at 201-202. See also MCR 3.973(F). And, a respondent is entitled to notice of all dispositional hearings, MCR 3.921(B)(1)(d), as well as an opportunity "to examine and controvert written reports" submitted to the trial court by petitioner and to "cross-examine individuals making the reports when those individuals are reasonably available," MCR 3.973(E)(3). *Further still, the trial court is not to presume during this time that the parent is unfit.* See *In re Mason*, 486 Mich 142, 168; 782 NW2d 747 (2010). Therefore, because respondents are given notice and an opportunity to be heard before the children are placed outside of the home or parental rights are terminated, we find that the one-parent doctrine does not violate a respondent's right to procedural due process. [Emphasis added.]

19

other reason we reach different results, in my opinion, is attributable to the majority opinion's erroneous assumptions that "[t]he [adjudication] trial is the only fact-finding phase regarding parental fitness," "[t]he statutes and court rules governing the dispositional phase . . . simply do not demand any fitness determination," and "[t]here is no presumption of fitness in favor of the unadjudicated parent." This is not accurate. As addressed earlier, the statutory provisions and court rules, as they should, presume that parents are fit and require the state to prove a parent's unfitness before the state can remove a child from a parent's custody. See, for example, MCL 712A.18f(1)(c) and (d) and (4) and MCR 3.973(F)(2), which only allow the court to remove a child from a parent's custody if doing so would be "necessary in the interest of the child," after considering the "[l]ikely harm to the child if the child were to be separated from his or her parent" and the "[l]ikely harm to the child if the child were to be returned to his or her parent," and even then requires the court to specify in the order what "reasonable efforts have been made to prevent the child's removal from his or her home . . . ."[17] In addition,

---

[17] Laird's counsel has authored a thoughtful article in which he proposes a "policy solution that balances the constitutional rights of the nonoffending parent with the interests of the child and the other parent." Sankaran, 82 Temp L Rev at 70. The following is his proposed solution:

> My proposed solution consists of two guiding principles. First, a juvenile court must be afforded the flexibility to assume jurisdiction over a child based on findings of maltreatment against one parent. This authority is essential to ensuring that the court has the ability to issue orders to remedy the abuse or neglect by the offending parent. Second, in order to respect the constitutional rights of the nonoffending parent, the court's power should be limited. While the case is ongoing, absent proof of parental unfitness, the court must grant custodial rights to the nonoffending parent to the satisfaction of that parent. [*Id*. at 84.]

20

the state must prove that a parent *remains* unfit in order for the state to continue depriving a parent of his or her right to the custody of his or her child. See, for example, MCL 712A.19(6)(d) and (e) and (8), which requires the court to "determine the continuing necessity and appropriateness of the child's placement" after considering the "[l]ikely harm to the child if the child continues to be separated from the child's parent" and the "[l]ikely harm to the child if the child is returned to the child's parent." See also MCL 3.975. Finally, "[a] permanency planning hearing shall be conducted to review the status of the child and the progress being made toward the child's return home . . . ." MCL 712A.19a(3). If "the court determines at a permanency planning hearing that the return of the child to his or her parent would not cause a substantial risk of harm to the child's life, physical health, or mental well-being, the court shall order the child returned to his or her parent." MCL 712A.19a(5); see also MCR 3.976(E)(2).[18]

In my opinion, this proposed solution is fully consistent with existing Michigan law because under that law, as discussed earlier, the court is "afforded the flexibility to assume jurisdiction over a child based on findings of maltreatment against one parent," but "absent proof of parental unfitness, the court must grant custodial rights to the nonoffending parent to the satisfaction of that parent." *Id*. However, Sankaran then proceeds to argue that a finding of unfitness would first require "the filing of a petition against the nonoffending parent, which would then trigger all the procedural protections available under state law." *Id*. at 85. In other words, he argues that a finding of unfitness must occur during the adjudicative phase of the proceedings, rather than during the dispositional phase. However, neither Sankaran nor the majority opinion nor anyone else of whom I am aware has identified any support for this proposition-- that is, the proposition that the Constitution demands that a finding of unfitness occur during the adjudicative phase. Once again, it is important to remember that the issue before this Court is not whether requiring a finding of unfitness to be made during the adjudicative phase would be a *wise* policy decision, only whether the *Constitution* requires that this finding be made during that phase.

[18] The majority opinion, although it apparently recognizes that the permanency planning

While I agree with the majority opinion that the state, absent exigent circumstances,[19] cannot remove a child from a parent's custody or otherwise interfere with a parent's parental rights without first finding that the parent is unfit, I do not believe that our current statutory scheme, encompassing as it does the one-parent doctrine, allows the state to do so.[20] As discussed earlier, " '[s]tatutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent.' " *Advisory Opinion*, 490 Mich at 307 (citation

---

hearing statute, MCL 712A.19a(5), requires a finding of unfitness, proceeds to state "that there is no similar requirement during the earlier dispositional hearings . . . ." Thus, in this regard, it fails to recognize that the statutes cited previously, MCL 712A.18f and MCL 712A.19, include "similar requirement[s] during the earlier dispositional hearings."

[19] See MCL 712A.14a(1), which allows the state to immediately take a child into protective custody "[i]f there is reasonable cause to believe that a child is at substantial risk of harm or is in surroundings that present an imminent risk of harm and the child's removal from those surroundings is necessary to protect the child's health and safety . . . ." See also MCL 712A.14b(1)(a).

[20] The majority opinion also argues that "[a]bsent some fact-finding regarding that parent's alleged neglectful or abusive conduct, . . . the DHS cannot reasonably be expected to formulate an individualized plan, resulting in unadjudicated parents being ordered to comply with potentially unnecessary and costly service plans." The majority opinion's concern is premised on its erroneous assumption that the court can order a parent to comply with a service plan without first considering what services are necessary. However, MCL 712A.6 expressly states that the court "may make orders affecting adults as in the opinion of the court are *necessary* for the physical, mental, or moral well-being of [the child] under its jurisdiction." (Emphasis added.) In addition, MCL 712A.18f(4) states that "[t]he court may order compliance with all or any part of the case service plan as the court considers *necessary*." (Emphasis added.) Therefore, contrary to the majority opinion's suggestion, the trial court cannot order a parent to comply with "unnecessary" or arbitrary service plans. Instead, the service plan must be determined to be *necessary* to serve the best interests of the child, over whom jurisdiction has already been obtained by the court. Indeed, even Laird himself does not argue that he was ordered to comply with an "unnecessary" service plan.

22

omitted). Accordingly, if it is possible to reasonably construe statutes to avoid unconstitutionality, it is this Court's duty to do so. *Evans Prods Co v State Bd of Escheats*, 307 Mich 506, 548; 12 NW2d 448 (1943) ("We are compelled to construe Act No. 170, in accordance with well-defined rules of statutory construction, in such manner as to avoid constitutional pitfalls, if this can be reasonably done within the legislative intent."). Because I believe it is possible to reasonably construe the statutes (as well as the court rules) at issue here to avoid unconstitutionality, it is our obligation to do this. See *Hooper v California*, 155 US 648, 657; 15 S Ct 207; 39 L Ed 297 (1895) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."). It is entirely reasonable to construe the pertinent statutes and court rules as requiring a finding of unfitness before the state can interfere with parental rights.[21] Although these statutes and court rules do not require this finding

---

[21] While the majority opinion relies on its "duty to interpret [the law] as being constitutional whenever possible" to reject the Court of Appeals' interpretation of the law in *CR*, which the majority opinion views as "grant[ing] trial courts unfettered authority to enter dispositional orders," it fails to give any consideration to this same "duty to interpret [the law] as being constitutional whenever possible" when it rejects the Court of Appeals' interpretation of the law in *Mays II*, which requires a finding of unfitness before the state can interfere with parental rights. See *ante* at 18 n 14 ("The [law] governing the dispositional phase . . . simply do[es] not demand any fitness determination."). If the majority opinion believes that it has such a "duty," is it truly not even reasonably *possible* to interpret the law as requiring a finding of unfitness when several Court of Appeals panels have been readily capable of doing so? If the majority opinion would apply its "duty" with consistent force, it would be far more likely to reach the same conclusion as the Court of Appeals that the law does not grant an "unfettered authority" to enter dispositional orders because those orders must be "*necessary* for the physical, mental, or moral well-being of [the child] under [the court's] jurisdiction," MCL 712A.6, and there must be a finding of unfitness before the state can intervene because MCL 712A.18f(1)(c) and (d) and (4) and MCR 3.973(F)(2) only allow the removal of a child from a parent's custody where doing so is "necessary in the interest of the child," after

23

of unfitness to be made during the adjudicative phase of the proceedings, I see nothing in the Constitution that would require such a finding to be made during that particular phase. Therefore, unlike the majority opinion, I do not find it necessary to strike down as unconstitutional any of the pertinent statutes and court rules. "In assessing what process is due in this case, substantial weight must be given to the good-faith judgments of the individuals charged" by "we the people" to adopt fair procedures-- the Legislature-- "that the procedures they have provided assure fair consideration . . . ." *Mathews*, 424 US at 349. The majority opinion, as far as I can see, does not accord any weight to the good-faith judgments of the Legislature, and instead of presuming that the statutes and court rules at issue are constitutional, it presumes from the very beginning the opposite, which is yet another reason why I reach a different result.

The fairness of the procedures adopted by the Legislature is well demonstrated by the particular facts of this case. As Laird concedes, the court properly exercised jurisdiction over the children given the mother's no-contest plea. At this point, the children were placed with Laird and it was only after he tested positive for cocaine that the children were removed from his care. In other words, Laird was not presumed unfit. Instead, he was clearly presumed fit; otherwise the children would never have been placed with him to begin with.[22] However, Laird then *proved* himself to the DHS and the

_____

considering the "[l]ikely harm to the child if the child were to be separated from his or her parent" and the "[l]ikely harm to the child if the child were to be returned to his or her parent," and further require the court to specify what "reasonable efforts have been made to prevent the child's removal from his or her home . . . ."

[22] Indeed, at oral arguments, Laird's counsel conceded that "[t]he state did presume that he was fit."

trial court as being unfit by testing positive for cocaine. See *Farris*, unpub op at 7 ("Though a trial court may not presume that a parent is unfit, Farris's conduct throughout the course of this case demonstrated that he was *not* a fit parent.") (citation omitted). It was only at this point that the decision to place the children with Laird was reevaluated-- at the point at which the court became aware that Laird had tested positive for cocaine, had been arrested for distributing cocaine,[23] had stopped participating in random drug screens, had been getting high with the children's mother, and had allowed the children's mother to have contact with the children even though the DHS had told him not to allow her to have such contact.[24] Laird lived with his mother and there were concerns about her as well, including significant mental health issues, as well as a history of interaction with the DHS. There was also no available bedroom for the children at Laird's mother's house, the court was aware that Laird remained on probation for domestic violence, and the court knew that the psychologist who had conducted an evaluation of Laird had concluded that

> [i]t does not appear that Mr. Laird is a candidate for reunification with his young children based on his violent history, the fact that he denies his entire history of violence and takes absolutely no responsibility for it, his substance abuse issues and his severe psychopathology. He has no insight into his own functioning, and sees no need to change anything about

---

[23] More recently, Laird was convicted in federal court of conspiracy to distribute more than 500 grams of cocaine and thus is currently imprisoned and unable to take custody of the children. However, I agree with Laird and the majority opinion that this fact does not render this case moot because incarcerated parents still have a constitutionally protected interest in the "management of their children."

[24] According to the mother, she was spending every night with Laird and the children.

himself as he believes he is good the way he is and that other people simply need to realize what he believes.

The court considered all this information, including Laird's own testimony, and decided that Laird was, at least temporarily, an unfit parent. Because this determination was made (a determination that Laird does not even contest), the trial court had the requisite authority to place the children with someone other than Laird and to order him to comply with a service plan in order to regain custody of his children.

Laird argues that the trial court had to "adjudicate" him in order to find him unfit, and the majority opinion agrees with him in this regard. Laird and the majority opinion rely heavily on *Stanley*, 405 US at 649, which held that "as a matter of due process of law, Stanley was entitled to a hearing on his fitness as a parent before his children were taken from him . . . ." Stanley was an unwed father who cared for his children until the children's mother died, at which point the state took his children away from him on the basis of an Illinois law that provided that the children of unwed fathers become wards of the state upon the death of the mother. The United States Supreme Court held that this law violated Stanley's right to due process because parents are entitled to a hearing on their fitness before their children can be taken away. The state cannot simply presume that all unwed fathers are unfit parents. However, *Stanley* never specified what *type* of hearing must be convened. Therefore, Laird's reliance on *Stanley* for the proposition that he is constitutionally entitled to a jury trial during the adjudication phase of a child-protective proceeding is misplaced. *Stanley* merely held that a hearing is required, and in the instant case *multiple* hearings were held regarding the placement of Laird's

26

children.[25] The children were initially placed with him because he was presumed to be a fit parent (unlike Stanley), but when his drug problems resurfaced, the children were removed from his care.[26] This removal, and whether this removal should continue, i.e., Laird's fitness as a parent, was the subject of multiple hearings-- the November 16, 2011 preliminary hearing, the January 11, 2012 pretrial hearing, the February 7, 2012 adjudication hearing, the February 22, 2012 dispositional hearing, the May 2, 2012 dispositional review hearing, the August 22, 2012 dispositional review hearing, and the

---

[25] Contrary to the suggestion of the majority opinion, *Stanley* did not hold that a parent is entitled to a jury trial on the issue of his or her fitness as a parent. Indeed, the United States Supreme Court has explicitly held that "trial by jury in the juvenile court's adjudicative stage is *not* a constitutional requirement." *McKeiver v Pennsylvania*, 403 US 528, 545; 91 S Ct 1976; 29 L Ed 2d 647 (1971) (emphasis added). Furthermore, as explained earlier, although Laird did not have a right to a jury trial, he *did* have a right to a hearing in which he was allowed to introduce "[a]ll relevant and material evidence," including "any written or oral information concerning the child from the child's parents," MCR 3.973(E)(2), to "examine and controvert written reports" offered to the court, MCR 3.973(E)(3), and to "cross-examine individuals making the reports when those individuals [were] reasonably available," *id*.

[26] As explained by the Court of Appeals in *Slater/Weimer*, unpub op at 3-4:

> The case at bar is distinguishable because unlike in *Stanley*, the one-parent doctrine does not presume that parents are unfit. Rather, the doctrine permits the trial court to exercise jurisdiction over children because petitioner established that the children were abused or neglected. Furthermore, before parents are declared unfit under the one-parent doctrine, they are . . . afforded certain procedural protections during the dispositional phase of the proceedings. Thus, *Stanley* is inapposite.

*Stanley* merely held that a parent must be presumed to be a fit parent and that a parent is entitled to a hearing before being deemed unfit, and that is exactly what happened in the instant case.

September 5, 2012 hearing on the motion for immediate placement. As explained by the trial court:

> Here, just as in *In re CR*, the father has been involved in all court proceedings since the inception of the petition. He has been provided with appointed counsel, he has been informed of the conditions that necessitated removal (including domestic violence and drug abuse) and he has been offered services to address these conditions. No action has been taken to terminate his parental rights, which would necessarily require that a supplemental or amended petition be filed. He most certainly would be entitled to a trial before his parental rights could be terminated. At that trial his parental rights could be terminated only upon clear and convincing evidence that a statutory basis exists for termination.

### 3. THE BURDENS OF ADDITIONAL PROCEDURAL SAFEGUARDS

"[T]he final factor to be considered is the public interest." *Mathews*, 424 US at 347. "[T]he interest of the state as *parens patriae* is for the welfare of the child." *Brock*, 442 Mich at 112-113. "[T]he State has an urgent interest in the welfare of the child . . . ." *Lassiter v Dep't of Social Servs of Durham Co*, 452 US 18, 27; 101 S Ct 2153; 68 L Ed 2d 640 (1981).[27] "The state's interest in protecting the child is aligned with the child's interest to be free from an abusive environment." *Brock*, 442 Mich at 113 n 19. That is, the child's interest and the state's interest overlap and are both relevant considerations in the due process analysis. Given this overlap, it is difficult, if not impossible, to consider the state's interest without at the same time considering the child's interest. Therefore, both the state's interest and the child's interest must be taken into account when considering this final factor. See *Santosky*, 455 US at 766 ("Two state interests are at

---

[27] In *Lassiter*, 452 US at 31, the United States Supreme Court held that the Constitution does not require the appointment of counsel in every proceeding to terminate parental rights.

stake in parental rights termination proceedings—a *parens patriae* interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings.").

" 'The child has an interest in the outcome of the fact-finding hearing independent of that of the parent.' " *Brock*, 442 Mich at 113 n 19 (citation omitted).[28]  Children have an interest in being protected from abusive and neglectful parents.  And "the state has a legitimate interest in protecting children who are neglected or abused by their parents." *Mays II*, unpub op at 2.  "[I]n child abuse proceedings, 'the rights of parents are a most essential consideration, but we further recognize that the best interests and welfare of the child outweigh all other considerations.' "  *Brock*, 442 Mich at 114 (citation omitted). Parents "have an important liberty interest in the management of their children that is protected by due process.  However, the child's welfare is primary in child protective proceedings." *Id*. at 114-115.  "[T]he paramount purpose of the juvenile section of the Probate Code is to provide for the well-being of children." *In re Macomber*, 436 Mich

---

[28] Although the majority opinion addresses at length the *parental* interests involved in this case, it mentions in only the most peremptory way, in a footnote, that there is also the *child*'s interest, which is an indispensable part of the constitutional due process analysis in this case.  These differing approaches go to the heart of our differing constitutional conclusions.  That is, while the majority opinion believes the most important (if not the exclusive) constitutional interest involved is that of the parent, I respectfully believe the most important (albeit not the exclusive) constitutional interest involved is that of the child.  In a perfect world, these interests would invariably be aligned.  However, in the highly imperfect world from which child-protective cases tend to come-- arising out of often highly dysfunctional households-- this is not necessarily true, and in such cases, I believe the child's interests must be viewed as paramount, specifically the child's interest in the due process analysis required by *Mathews*, in which the child's interests are given consideration in *conjunction* with the interests of the parent.

386, 390; 461 NW2d 671 (1990). "One significant feature common to all child custody cases, regardless of the procedural label, is this Court's insistence upon the child's best interest prevailing as the predominant, if not sole, judicial concern." *In re Ernst*, 373 Mich 337, 361; 129 NW2d 430 (1964). " 'We recognize the long-established rule that the best interest of the child is of paramount importance and that it is our judicial duty to safeguard his welfare and care.' " *Id*. at 369 (citations omitted). "The paramount question under the law in all cases of this character is the welfare of the child. All other considerations must yield to this one." *Id*. at 370 (citations and quotation marks omitted).

Because "the risk of an erroneous deprivation" of a parent's interest is already minimal with the current procedures in place, the added or marginal value, if any, that would be served by requiring both parents to be adjudicated before the court could proceed to the dispositional phase is considerably outweighed by the added burdens that would be imposed on the state and children. As even the majority opinion recognizes, "[t]here is no doubt that requiring adjudication of each parent will increase the burden on the state . . . ." See *Mathews*, 424 US at 335 (stating that "the probable value, if any, of additional or substitute procedural safeguards" as well as the "fiscal and administrative burdens that the additional or substitute procedural requirement would entail" should be considered when determining what process is due). This is far less important, however, than the fact that any added or marginal value of the new safeguards would be considerably outweighed by the additional burdens on the children involved. See *id.* at 347 (stating that "the administrative burden and other *societal costs* that would be associated with requiring [the additional or substitute procedural requirement], as a matter of constitutional right," should also be considered) (emphasis added). Once it has

30

been determined following a jury trial that a child has been abused or neglected by one parent, that child should not have to wait for a secure placement until it has been determined, following an additional jury trial, that the other parent-- most particularly one who has actually resided in the same household as the abusing or neglecting parent-- is implicated in the same abuse or neglect.

Abolishing the one-parent doctrine, as the majority opinion does today, will cost the state in terms of time, financial resources, and social-services manpower because it will now have to adjudicate both parents as unfit before it can even *exercise jurisdiction* over abused and neglected children.[29]  However, this is the least of the burdens imposed by judicial abolition of the doctrine.  Rather, it is the additional costs and burdens that will now be placed on abused and neglected children themselves that is most troubling.  These children, who are in the greatest need of expedited public protection, may eventually be afforded that protection, but considerably less quickly because a parent (again, most particularly a parent who has resided in the same household as the adjudicated and unfit parent) will for the first time become constitutionally entitled to a jury trial.[30]  Because I do not believe the latter is required by our Constitution, and

---

[29] Once again, this jurisdictional determination is altogether *distinct* from any actual termination of parental rights or even from any determination that a parent is not entitled to custody pending further proceedings.

[30] The majority opinion disputes that it has "found a constitutional right to a jury trial in child protective proceedings."  Instead, it "simply hold[s] that due process requires a specific adjudication of a parent's unfitness . . . ."  Never mind that the majority's "specific adjudication of a parent's unfitness" is necessarily and always a jury trial.  Although the majority is correct that "[t]he right to a jury trial is granted by statute," *this* specific right only applies to the adjudication of the first parent, in the course of which the state may obtain jurisdiction over the abused or neglected child.  By holding that the

31

because it is obvious that this will ensure that a child will remain for a longer time with the unadjudicated parent who may have resided in close proximity with the adjudicated and unfit parent, I respectfully dissent.[31] Although I agree with the majority opinion that *all* parents are entitled to due process in the child-protective context, with the presumption of fitness and the burden of proof to the contrary resting on the state, I see no constitutional barriers to the long-established procedures in this state in guaranteeing that such a fitness determination is fairly made.[32]

While the majority opinion recognizes that "requiring adjudication of each parent will increase the burden on the state," it does not acknowledge the greater risk that the formal adjudication it requires of each parent will increase the burdens on the abused or neglected child, who may remain in an unsecure position for a prolonged period. Just as the majority opinion's failure to recognize that the current procedural requirements

_____

Due Process Clause of the Constitution requires that the *second* parent of the abused or neglected child is also entitled to a jury trial, rather than to any other form of due process, the majority has not only expanded a statutory "right," but transformed it into a constitutional right.

[31] I am cognizant that the instant case does not involve two parents living in the same household with the children, but the majority's abolition of the one-parent doctrine will apply in that situation just as much as it applies to the instant situation. That reality is precisely what is signified by the regular inquiries of justices at oral argument about the legal rules and principles that attorneys would offer for the resolution of their cases that are equally appropriate in the next "one hundred" cases of the same kind.

[32] I am cognizant that the state can immediately take a child into protective custody "[i]f there is reasonable cause to believe that a child is at *substantial* risk of harm or is in surroundings that present an *imminent* risk of harm and the child's removal from those surroundings is *necessary* to protect the child's health and safety . . . ." MCL 712A.14a(1) (emphasis added). See also MCL 712A.14b(1)(a). However, not all children who are in need of protection will be readily able to qualify for protection under these demanding standards, and it is *these* children about whom I am most concerned.

32

adequately protect parents' rights has caused it to conclude that the risks of erroneously depriving parents of their rights are great, its failure to recognize that requiring adjudication of each parent will increase the burden on abused and neglected children has caused it to conclude that the additional burdens that will be imposed as a result of requiring adjudication of each parent are minimal. This in turn has caused the majority opinion to conclude that "those burdens do not outweigh the risks associated with depriving a parent of [his or her] right[s] . . . ." When the risks and the burdens are calculated more realistically, I believe it is clear that the latter considerably outweigh the former. As explained earlier, the risks are low because the Legislature has already adequately afforded a range of protections for parental rights, while the burdens are high because abused and neglected children in many cases will be left for significantly longer periods of time than are necessary in the care of a parent who may ultimately be proved unfit. While I agree with the majority opinion that "constitutional rights do not always come cheap," I do not agree that there is any constitutional right to a jury trial in the instant context; while the parent of an abused or neglected child has an undeniable right to due process, this can take many reasonable forms.

## 4. SUMMARY

Given (a) the interest of children in being protected from abusive and neglectful parents, (b) the public's legitimate interest in protecting children from abusive and neglectful parents, (c) the fact that Laird was only deprived of a trial during the initial phase of the child-protective proceedings, which simply determines whether the trial court possesses jurisdiction over the children, (d) the fact that Laird's rights to his

33

children were adequately protected during the child-protective proceedings, and (e) the significant costs that would be inflicted on abused and neglected children of this state by entitling both parents to a trial on their unfitness before allowing the state to intervene to protect these children, I do not believe that Laird's constitutional rights to due process were violated by depriving him of a trial at the adjudicative phase of the process.[33]

In summary, I *agree* with the majority opinion that (a) pursuant to MCL 712A.2(b), "once there has been *an* adjudication, either by trial or plea, the court has jurisdiction over the child regardless of whether one or both parents have been adjudicated unfit"; (b) "[p]arents have a significant interest in the companionship, care, custody, and management of their children, and the interest is an element of liberty protected by due process"; (c) "there is a presumption that fit parents act in the best interests of their children"; (d) "all parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody," except that "[i]n the case of an imminent threat of harm, the state may take the child into custody without prior court authorization or parental consent"; (e) "the state has a legitimate and important interest in protecting the health and safety of minors"; (f) "requiring adjudication of each parent will increase the burden on the state"; (g) "constitutional rights do not always come cheap"; and (h) "Laird's complaint is not moot." (Citations and quotation marks omitted.) However, for the reasons set forth in this opinion, I

---

[33] Laird also argues that his equal protection rights were violated. However, he failed to raise this issue at the trial court, and thus this issue is not properly before this Court. See *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008) ("[A] litigant must preserve an issue for appellate review by raising it in the trial court. . . . [G]enerally a failure to timely raise an issue waives review of that issue on appeal.") (citation omitted).

34

respectfully *disagree* with the majority opinion's conclusion that both parents are constitutionally entitled to a jury trial on their fitness before children can be removed from their custody and placed within the protective jurisdiction of the court.

## 5.  THE CRUX OF THE PROBLEM

Concerning due process, it is always possible to extend additional procedural rights and entitlements to persons who come into contact with the government, as criminal defendants, public employees, consumers of public services, regulated parties, recipients of social-services benefits, or parents of abused and neglected children. Additional hearings and additional appeals can always be convened, more protective rules of evidence can always be prescribed, and broader compliance with ever finer details of process can always be required.  There is simply no end to the argument that "fairness" requires something more, and there is little specificity in the Due Process Clause that either sustains or refutes most such arguments.

It is for this reason that the principle of deference to the constitutional judgments of the legislative and executive branches is of critical importance here.  The threshold "presumption of constitutionality" of laws and rules enacted by the accountable branches of government is not a principle of jurisprudence deserving of mere passing reference, but, particularly in realms such as that of due process in which the constitutional text is so relatively open-ended and arguably compatible with alternative understandings of "fairness," it is a presumption necessary to ensuring that the judgments of the people and their elected representatives are not casually replaced by the contrary judgments of the judiciary.

What lies at the heart of the "presumption of constitutionality" is that the burden of persuasion rests heavily with the party seeking to upend the legal status quo to compellingly demonstrate that the people's elected representatives have erred in their understanding of the Constitution, and thus that the extraordinary power of judicial review should be exercised to strike down what has been enacted in the course of republican governance. As the breadth and open-endedness of a constitutional provision becomes increasingly pronounced, this does not become a warrant for the exercise of judicial discretion and intervention, but instead a warrant for the exercise of judicial deference-- a respect for a broad range of judgments on the part of the legislative and executive branches. For when it is uncertain whether the people's representatives have acted within the purview of the Constitution, when people can reasonably disagree about whether a particular procedure is or is not required by due process, it is *then* that the "presumption of constitutionality" becomes most important. Otherwise, the presumption is little more than cant, mere formalism, as opposed to a genuine limitation on the exercise of judicial power within our constitutional architecture of separated powers.

The "presumption of constitutionality," if it means anything, signifies that the burden rests upon the *judiciary*, as a precondition to the invalidation of a law enacted through the representative process, to affirmatively demonstrate incompatibility of that law with the Constitution. It is not the people's obligation to demonstrate constitutionality, but the judiciary's obligation to demonstrate the contrary. It is simply not enough that a tribunal believes that it would be "better" to do things differently than the people have chosen. Rather, it is the court's obligation to establish that under no

reasonable understanding of the Constitution could it countenance what the people have understood it to countenance.

What is further implicit in the "presumption of constitutionality" is that the legislative and executive branches must be viewed as no less committed than the judicial branch to upholding the Constitution, the principles of which include that citizens who interact with the government must be treated fairly and in accordance with the requirements of due process. Legislators, governors, and members of the cabinet each take an oath to support the Constitution, just as do judges. And it must be presumed that because the former are reasonably capable of *reading* the Constitution-- a document never intended to be the exclusive province of lawyers and judges, but intended to be accessible to all citizens-- legislators, governors, and members of the cabinet are also reasonably capable of *comprehending* their obligations under the Constitution, and reasonably capable of *acting* in accordance with these obligations. All of this is implied by the "presumption of constitutionality," and it is a presumption, if the separation of powers is to be maintained, that must be taken seriously when the representatives of the people act on behalf of those in whose name the Constitution was ratified.

And for at least 70 years, not only have the legislative and executive branches of this state acted to protect the interests of abused and neglected children through the enactment of laws that have *allowed* for the one-parent doctrine, but the judicial branch itself during this time has understood the laws underlying this doctrine to be fully constitutional, regularly reviewing and applying their provisions in countless numbers of cases involving abused and neglected children and their parents. No court of this state has previously understood these laws to run afoul of the supreme law of the land or of our

state.  At least not until today, when the people and their representatives have been newly informed that "fairness" now requires something considerably more.

What is it today that accounts for the nullification of the one-parent doctrine and (although it does not expressly say so) the laws that form this doctrine?  What is it today that accounts for the conclusion that the accountable branches, as well as the judiciary, have for all these years erred by believing that the protections and guarantees conferred by our laws on the parents of abused and neglected children were sufficient under the Constitution?  Is there some newly minted decision of the United States Supreme Court that has now compelled these conclusions?  None that the majority opinion identifies.  Are there new statutes or amendments that have been enacted by our Legislature that now warrant these results?  Again, none that are cited.  Are there new executive-branch policies or child-protective measures that have been introduced that now require these changes?  None that are referred to.  And is there any suggestion whatsoever that there has been some miscarriage of justice in the present case, or more generally that there have been injustices regarding our state's treatment of parents of abused and neglected children, or indeed even a *single* case indicative of serious shortcomings in this process?  The majority opinion apprises us of none.

The majority opinion likely presages that this will be the first of many decisions of this Court elaborating ever more finely on what "fairness" requires in the context of the parents of abused and neglected children.  There is no principled stopping point articulated that raises any barrier to future case-by-case-by-case expansions of due process.  And as invariably tends to occur when matters that were once the subject of representative decision-making become "constitutionalized," there will be a long line of

38

future decisions in which additional procedures, details, and hearings are successively layered on the child-protective process by the judiciary, ever more closely perhaps tracking the procedures, details, and hearings of the criminal justice process. As a result, the final disposition and placement of abused and neglected children will become increasingly delayed by trials and legal procedures, requiring, despite every justice's obvious solicitude for their interests, that abused and neglected children remain for extended periods in what child-protective workers might understandably view as a less-than-secure environment. And also as a result, the judgments of legislatures and governors, reached after committee and administrative hearings, the testimonies of witnesses of a wide variety of viewpoints, public debates inside and outside the chambers of government, and even occasionally after elections, will be replaced by the determinations of appellate judges, in which each new procedure, detail, and hearing becomes an issue of "constitutional right" and "entitlement." And thus once again, the realm of the lawyer and the judge expands, and the realm of ordinary citizens and those elected to represent them diminishes.

Our legislative and executive branches have adopted a broad array of procedures in support of the due process rights of the parents of the abused or neglected child. In the present case, Laird was afforded notice of multiple proceedings, an attorney to represent his interests at these proceedings, and an opportunity to be heard at these proceedings. Yes, more procedures, more details, more hearings, and more "constitutional" guarantees could doubtlessly be constructed by this Court, but again it is always possible to fill in the blanks of the Due Process Clause with more "rights" and "guarantees," albeit at some point only at a cost to other legitimate rights and interests, in this case those of the abused

or neglected child. The majority opinion is quite correct in recognizing that constitutional rights "do not always come cheap." However, it is for precisely that reason-- that there are, in fact, *costs* to the devising of new constitutional rights-- that a Court should take the utmost care, and exercise the utmost judicial humility, in deferring to the judgments and expertise of those public actors best equipped to reasonably balance the interests of abused and neglected children and their parents coming from seriously dysfunctional homes. And it is for the same reason that this Court should exercise the utmost care, and exercise the utmost judicial humility, in ensuring that any new expression of "constitutional rights" is genuinely grounded in the text and history of the Constitution and that the contrary judgments of the Legislature and the Governor are equally genuinely incompatible with that Constitution. Precisely because constitutional rights "do not always come cheap," this Court should seek to ensure that the "presumption of constitutionality" is faithfully honored to the point at which it can be genuinely said that the costs incurred by a new "constitutional right" must be incurred because that is what the Constitution *compels*, and the Constitution compels nothing *less*.

## IV. CONCLUSION

For these reasons, I would affirm the trial court and hold that *In re CR* correctly held that the one-parent doctrine, which has been a part of our statutory scheme for more than 70 years, is not unconstitutional under the Due Process Clause of the Fourteenth Amendment. The Legislature has adequately protected the due process rights of a parent of an abused or neglected child (a child whose other parent has already been adjudicated

unfit) by requiring a hearing on the parent's fitness before the state can interfere with his or her parental rights.

Stephen J. Markman<br>
David F. Viviano