*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* JOHNSON/CLEMENTS, Minors.

UNPUBLISHED
February 11, 2020

No. 348958
Genesee Circuit Court
Family Division
LC No. 18-135503-NA

Before: BOONSTRA, P.J., and TUKEL and LETICA, JJ.

LETICA, J. (*concurring in part and dissenting in part*).

Because petitioner's sole request was to ensure that respondents followed safe-sleep practices[1] as to AC, MC's surviving twin, I concur in the judgment to affirm the trial court's decision declining to take jurisdiction over respondents' four older children; however, I conclude that the trial court clearly erred in failing to take jurisdiction over AC, who required its protection in light of respondents' repeated failures to follow safe-sleep practices.[2]

---

[1] "Sleep-related infant death is a leading cause of death among infants less than 1 year in Michigan." Michigan DHHS / Safety & Injury Prevention / Safe Sleep / Fact Sheet available at <https://www.michigan.gov/mdhhs/0,5885,7-339-71548_57836-391909--,00.html> (accessed February 5, 2020). Genesee County has one of the highest rates of infant mortality. Michigan Public Health Institute PowerPoint Presentation available at <https://www.keepingkidsalive.org/wp-content/uploads/SRD-Fact-Sheet_Genesee.pdf>

(accessed February 5, 2020).

[2] As to respondents' children born after 2014, the hospital or health professional in charge at the birth of an infant would also have been required to provide "understandable information and educational and instructional materials regarding infant safe sleep practices" and obtain a parental acknowledgment form. MCL 333.5885.

## I. THE FACTS

The record is clear that petitioner had thrice explicitly warned respondents of the danger posed by failing to follow safe sleep practices since May 2015. These multiple warning cautioned against sleeping with an adult in an adult bed:

> I fully understand that it is never safe for an adult or child to sleep with an infant less than one year of age because this increases the risk of death or injury. I acknowledge that I have been informed of and understand the risks of unsafe sleep practices that may lead to possible death or injury.

And yet, respondents presented the following four versions of the circumstances surrounding nearly four-month-old MC's death in October 2018: (1) respondent-mother and respondent-father had MC and AC, his twin brother, between them on respondents' bed until the maternal grandmother removed AC and respondents fell asleep; (2) after the maternal grandmother removed AC, respondent-mother put MC to sleep on a pillow in the corner of respondents' bed while respondent-father watched television at the foot of the bed and respondent-mother folded some laundry before they dozed off; (3) at 4 a.m., respondents were watching television with MC and AC when respondent-mother reached over to check MC's "diaper and found him blue, cold, pulseless and not breathing;" or (4) subsequent to the maternal grandmother removing AC from respondents, MC went limp after respondent-mother had bottle-fed him, burped him, and was going to change him. The first scenario was the one respondent-mother re-enacted with the medical examiner's chief investigator. The second scenario was the one that respondent-mother shared with a DHHS worker at the hospital. The third scenario was the one shared with the emergency room doctor. And the fourth scenario was the one respondent-father shared with another DHHS worker. Photographs taken that morning reveal a lot of clothing, some shoes, and even an infant swing atop respondents' bed.

Moreover, it is undisputed that both respondents tested positive for marijuana.[3] Respondent-father, who had been prescribed psychotropic medications, also had benzodiazepine in his system from his prescription Xanax and further admitted to drinking a shot of liquor before bed. Likewise, respondent-mother admitted to earlier taking pain medication, but one that was not prescribed for her; this medication did not reveal itself in her later drug test.

It is further undisputed that the police arrived and saw one crib in respondents' bedroom. This single crib contained a stained mattress that was littered with two empty liquor bottles, rolled wire secured with black tape, cigarette ashes, a saltine cracker box, an empty one-gallon water bottle, a soiled diaper, an empty petroleum jelly container, a single toddler's shoe, a broken cell phone, a full clear plastic bag, and other assorted objects.

---

[3] MC and AC had tested positive for marijuana at birth.

Finally, it is undisputed that respondents had had not one, not two, but three separate, explicit warnings from petitioner about the dangers associated with unsafe sleep practices. All resulted in respondents' written acknowledgement and agreement to practice safe sleep with their infants.

In May 2015, petitioner investigated a complaint alleging that respondent-mother had struck her oldest child, who was five, with sufficient force to split his lip. During the course of that investigation, petitioner explained safe-sleep practices to respondents because their second child was five months old. Petitioner did so because Genesee County has a high child death rate. At that time, respondents signed their first safe-sleep agreement.

Even so, in October 2017, slightly more than a year before MC's death, petitioner discovered respondents' first set of twins, who were approximately four months old, sleeping together on their stomachs on a bunk bed while covered with a blanket. When petitioner again presented information regarding the importance of safe-sleep practices, respondent-mother retorted that "she was not going to use safe sleep because they were her children; she gave birth to them and she will sleep them however she chooses to." At that time, respondents had a bassinet, which was put away, and a Pack N' Play. Respondents' Pack N' Play contained items that were hazardous to a child under twelve months old, including clothing and other items. Despite respondent-mother's protest, she and respondent-father signed their second safe-sleep agreement.

In July 2018, when respondent-mother gave birth to MC and AC, respondents' second set of twins, their meconium tested positive for marijuana. This resulted in petitioner investigating respondents' home. Petitioner discovered that MC and AC were sleeping together in the same crib. Petitioner provided a Pack N' Play to respondents to ensure MC and AC would have safe, individual sleep spaces. For the third time, petitioner informed respondents about safe-sleep practices and respondents signed their third safe-sleep agreement.

Rather than using the Pack N' Play that petitioner had provided in October 2017 as a bed for MC or AC, respondents used it as a bed for one of their older set of twins. And, on the October 2018 morning that MC was hospitalized, a second Pack N' Play was found under the bunk bed used by respondents' older two children. That Pack N' Play was broken.

Thus, despite signing three separate sleep-safe agreements, respondents yet again failed to provide MC and AC with safe-sleep spaces despite acknowledging the increased danger of injury or death.

## II. STANDARD OF REVIEW

This Court reviews a trial court's decision whether to exercise jurisdiction for clear error. *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013).

## III. ANALYSIS

"In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase." *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014) (citation omitted). "Generally, a court determines whether it can take jurisdiction over the child in the first place during the adjudicative phase." *Id.* Jurisdiction is established pursuant to MCL 712A.2(b). Relevant to the instant case, that statute provides that a trial court has jurisdiction in proceedings concerning children under 18 years of age "[w]hose parent . . . when able to do so, neglects or refuses to provide . . . other care necessary for his . . . health," or "[w]hose home environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent ... is an unfit place for the juvenile to live in." MCL 712A.2(b)(1) and (2). To exercise jurisdiction, the trial court is required to find that the petitioner has proven a statutory ground found in MCL 712A.2(b) by a preponderance of the evidence. *In re BZ*, 264 Mich App at 295; MCR 3.972(C)(1). "Proof by a preponderance of the evidence means that the evidence that a statutory ground alleged in the petition is true outweighs the evidence that that statutory ground is not true." M Civ JI 97.37.

In petitioner's closing argument, petitioner argued that its burden of proof in establishing a jurisdictional ground was "a preponderance of the evidence." Nevertheless, after its on-the-record ruling, the trial court checked the box on its April 25, 2019 order of adjudication, indicating that petitioner had failed to present "clear and convincing evidence" of a statutory ground under MCL 712A.2(b). In so doing, the trial court bypassed the option of checking a box that stated it had applied "a preponderance of the evidence" standard.

On appeal, petitioner contends that the trial court erroneously imposed a higher burden of proof on it than the law required. On the other hand, respondents argue that the trial court's error was merely clerical and that its oral pronouncements clearly reflect that the trial court applied the correct burden of proof, that is, a preponderance of the evidence.

I agree with petitioner. Generally, "a court speaks through its written orders . . ., not through its oral pronouncements." *In re KMN*, 309 Mich App 274, 287; 870 NW2d 75 (2015) (quotation marks and citation omitted). Moreover, given petitioner's closing argument below and the fact that the trial court applied the incorrect standard in its subsequent written order, I conclude that petitioner's challenge in this regard is preserved, MCR 2.517(A)(7),[4] and that the trial court clearly erred. I further note that the trial court not only erroneously imposed a higher burden of proof on petitioner than the law requires, but it also prematurely considered the children's best interests in declining to exercise its jurisdiction. Cf. MCL 712A.19b(5). The legal questions before the trial court were whether petitioner satisfied its burden of establishing a jurisdiction ground under MCL 712A.2(b) by a preponderance of the evidence, and, if so, whether the court should exercise its jurisdiction over the children. The children's best interest is to be considered at the termination stage, not at the adjudicative stage. MCL 712A.19b(5).

---

[4] "No exception need be taken to a finding or decision."

Respondents further contend that any error in the burden of proof applied by the trial court is irrelevant because the trial court also found no evidence that respondents' unsafe-sleep practice caused MC's death. While it is true the trial court made that finding after Dr. Hunter opined that the manner of MC's death was undetermined, Dr. Hunter reached this conclusion because there was no "concrete evidence . . . of the position that the child was found in when he . . . is found unresponsive" and no "documented evidence of" the parent "overlaying" the child. In other words, because respondent-mother moved MC from where she had placed him on respondents' bed in order to administer CPR and because there was no physical evidence that either respondent had actually overlain MC, the county medical examiner concluded that MC's manner of death was undetermined in an unsafe sleep environment, more particularly, a "shared sleep surface and adult bedding." On the other hand, Dr. Nolan testified that based on the history that he was provided and MC's medical records, MC's death was "[p]robably . . . a positional asphyxia." As Dr. Nolan explained, when babies died for no apparent reason in the past, such deaths were attributed to Sudden Infant Death Syndrome (SIDS). Now, however, medical practitioners know that most of those infants "died from something else like a sleep situation." Thus, contrary to respondents' argument that the dispositive question was whether unsafe-sleep practices actually caused MC's death, the fact remains that MC's death occurred in circumstances involving respondents' unsafe-sleep practices for infants who depended on them for care and protection.

Indeed, in explaining its decision not to take jurisdiction over respondents' children, the trial court recognized the danger to AC and implored respondents to practice safe sleep by not sharing a bed with their remaining children in the future. The trial court opined that respondents had learned their lesson and there was nothing to be gained from taking jurisdiction for the two months that AC would remain under twelve months of age.

In my opinion, the trial court clearly erred when it concluded that jurisdiction over AC was unwarranted. Petitioner demonstrated by a preponderance of the evidence that respondents "when able to do so, neglect[ed] or refuse[d] to provide . . . other care necessary for [the child's] . . . health." MCL 712A.2(b)(1). Respondents knew that following safe-sleep practices would reduce the risk of injury or death for an infant under twelve months of age. Petitioner had explicitly explained those risks to respondents three times and provided a Pack-N'-Play so that MC and AC would have separate spaces to sleep safely. Respondents had thrice signed safe-sleep agreements. Nevertheless, respondents failed to follow safe-sleep practices to protect MC and AC's health. The crib in respondents' bedroom was riddled with trash, including cigarette ash, two empty liquor bottles, and a used diaper, among numerous other items, atop a stained mattress that was unsafe for either MC or AC. Moreover, respondents used the Pack-N'-Play that petitioner had provided for MC or AC as a sleep space for one of their older twins. And respondents, who had a marijuana grinder on the dresser in the bedroom that they shared with their young children, tested positive for marijuana. Respondent-father, who was prescribed psychotropic medication, admitted drinking a shot before bed and, again, two empty liquor bottles were found in the crib that was to supposed to provide a safe-sleep environment for MC or AC. In light of these additional risk factors, respondents' conflicting accounts of the events surrounding MC's unresponsive condition, and respondents' repeated failures to follow safe-sleep practices, despite

-5-

the known dangers of failing to do so, the trial court clearly erred in failing to exercise jurisdiction to protect AC.[5]

I recognize that AC has since passed the age where he is at greatest risk from respondents' failure to follow safe-sleep practices. However, I conclude that this matter is not moot because the failure to take jurisdiction when it is warranted impacts the information maintained in the State's Central Registry.[6] MCL 722.627(7).

For these reasons, I would affirm the trial court's decision not to exercise its jurisdiction over respondent's four older children, but would reverse its clearly erroneous decision not to exercise jurisdiction over AC.

/s/ Anica Letica

---

[5] I concur in the judgment to affirm the trial court's order concluding that the evidence was insufficient to establish a statutory ground to take jurisdiction over respondents' older children. The fact that there may be statutory grounds to assume jurisdiction over one minor child does not automatically mean that there are statutory grounds to assume jurisdiction over a separate minor child. See *In re Churchill/Belinski*, 503 Mich 895; 919 NW2d 285 (2018), vacated in part and remanded 503 Mich 984; 923 NW2d 885 (2019) (vacating the trial court's order of adjudication and dispositional order over two of the respondent-mother's three children because "[t]here is no independent basis to conclude that [they] come within the statutory requirements of MCL 712A.2(b)."). Here, the testimony and evidence presented during the hearing demonstrated that respondents provided appropriate care for their older children.

[6] The record below suggests that respondent-mother's nursing employment would be affected by her status on the State's Central Registry.