*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* L. A. MARTIN, Minor.

UNPUBLISHED
May 30, 2024

No. 366730
Kalamazoo Circuit Court
Family Division
LC No. 2020-000082-NA

Before: YATES, P.J., and CAVANAGH and BOONSTRA, JJ.

PER CURIAM.

Respondent-father appeals of right a trial-court order terminating his parental rights to his minor son, LM, under MCL 712A.19b(3)(a)(*ii*) (desertion), (3)(c)(*i*) (no reasonable likelihood that parent will rectify conditions that led to adjudication), and (3)(j) (reasonable likelihood that child will be harmed if returned to the parent). On appeal, respondent-father contends that he was not afforded a meaningful opportunity to participate in reunification services because the Department of Health and Human Services (DHHS) failed to continue providing services to respondent-father after he was reunited with LM. Additionally, respondent-father asserts that he was denied effective assistance of counsel at the termination hearing, where the trial court allowed a substitute attorney to represent him. We affirm.

## I. FACTUAL BACKGROUND

In 2020, the DHHS filed a petition asking the trial court to exercise jurisdiction and remove then-four-year-old LM from the care of his mother.[1] Respondent-mother and respondent-father are married, but in 2020 respondent-father was incarcerated on charges of operating or maintaining a methamphetamine lab and possessing methamphetamine, with an earliest release date in April 2021. The trial court noted that it did not require minor children to attend visits with their parents in prison, but the trial court asked the caseworker to investigate whether Facetime visits could be provided.

---

[1] During the course of these proceedings, LM's mother made substantial progress and the DHHS changed the permanency goal to reunification. Therefore, LM's mother is not party to this appeal.

At a permanency planning hearing on February 2, 2021, a DHHS caseworker testified that respondent-father had taken classes while incarcerated, successfully engaged in parenting visits by telephone, and sent letters to LM. After respondent-father's release from prison on April 27, 2021, respondent-father began having extended unsupervised visits with LM. In addition, respondent-father obtained employment, participated in substance-abuse treatment, and consistently reported for drug screening. The trial court noted that LM's mother was minimally involved and, if not for respondent-father, the case would be going in a very different direction. The trial court found that reasonable efforts to reunify respondent-father and LM had been made during the reporting period and ordered that reunification remain the permanency planning goal.

Respondent-father eventually began having overnight visits with LM. There was no formal order placing LM with respondent-father, but testimony and comments on the record in subsequent hearings reveal that LM was placed with respondent-father in January 2022 but then removed from his care in February 2022. A caseworker thereafter testified that LM was in a licensed foster home, was up to date on his medical and dental appointments, was engaged in counseling, and was doing well in school. The caseworker explained that, on January 20, 2022, respondent-father had tested positive for methamphetamine. Respondent-father at first denied using methamphetamine, but he later admitted that he had relapsed. Furthermore, while LM was in respondent-father's care, there was a breach of the safety plan because respondent-father allowed respondent-mother to be around LM. As a result, respondent-father was told that all visits with LM would take place at the foster family's home and would have to be set up through the DHHS. The situation deteriorated, and the trial court ordered the DHHS to initiate termination proceedings at the conclusion of a permanency planning hearing on May 31, 2022.

On June 29, 2022, the DHHS filed a supplemental petition for termination of the parental rights of respondent-father, who had taken part in only one recent parenting-time visit and was no longer engaging in services. Also, respondent-father had missed 20 drug screens. The DHHS was investigating a relative placement with LM's maternal grandmother and maternal aunt based on a request from respondent-mother, who had begun making progress and exhibiting a close bond with LM that prompted the DHHS to change the permanency goal from adoption to reunification with respondent-mother. But the DHHS sought termination of respondent-father's parental rights.

The one-day termination hearing took place on May 16, 2023, nearly a year after the DHHS filed the supplemental petition. By that time, respondent-father had lost his sobriety, his housing, and his job. Although respondent-father did not even show up for the termination hearing, counsel for respondent-father noted that the permanency goal for respondent-mother had been changed to reunification, so he asserted that termination of respondent-father's parental rights was not needed to keep LM safe. Counsel reasoned that respondent-mother could obtain a divorce and custody of LM, which would result in an award of sole custody of LM through a domestic order. Respondent-mother expressed her desire for a divorce, but she could not afford one. The trial court explained that LM was doing very well in respondent-mother's care, so it was not a good idea to leave open the possibility that respondent-father, who was putting forth no effort to reunify with LM, could make his way back into the picture. The trial court found that the statutory grounds for termination were proved by clear and convincing evidence and that termination of respondent-father's parental rights was in LM's best interests. The trial court also found that reasonable efforts were made to preserve and reunify the family, but those efforts were unsuccessful because of respondent-father's behavior. In response to the termination of his parental rights, respondent-father appealed.

## II. LEGAL ANALYSIS

On appeal, respondent-father contests the adequacy of the efforts exerted by the DHHS to reunite him with LM and the effectiveness of the attorney who represented him at the termination hearing on May 16, 2023. We shall address each of those arguments in turn.

### A. REASONABLE EFFORTS

Respondent-father insists that he was denied an opportunity to meaningfully participate in reunification efforts because the DHHS failed to provide him with reasonable efforts after LM was placed with him. We review a "trial court's factual finding that petitioner made reasonable efforts to reunify" the respondent-parent with the child for clear error. *In re Atchley*, 341 Mich App 332, 338; 990 NW2d 685 (2022). But respondent-father did not object to the services provided by the DHHS at any time during the proceedings in the trial court. As a result, the issue was not preserved for appellate review, and our review is "limited to plain error affecting substantial rights." *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Id*. at 9.

"In general, when a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal by adopting a service plan." *In re Fried*, 266 Mich App 535, 542; 702 NW2d 192 (2005). A trial court need not order initiation of "proceedings to terminate parental rights if . . . [t]he state has not provided the child's family . . . with the services the state considers necessary for the child's safe return to his or her home, if reasonable efforts are required." MCL 712A.19a(8)(c). But just as the DHHS "has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). A respondent-parent must not only cooperate and participate in the services, but also benefit from them. *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014).

The record shows that LM was placed with respondent-father in January 2022, but LM was subsequently removed from respondent-father's care in February 2022. Respondent-father argues that the DHHS failed to explain why he was not offered additional services when LM was placed with him, and he suggests that he could have benefited from services like random drug screening, substance-abuse counseling, and support groups. But during the termination hearing, a caseworker testified that, beginning in January 2022, respondent-father began to relapse, missed random drug screening, and began testing positive for methamphetamine. The caseworker further testified that respondent-father indicated that he was unsure why he had to comply with services when LM was already placed with him. Even after the caseworker discussed the importance of compliance with respondent-father, he still could not grasp that he needed to comply with services, which resulted in LM being removed from his care. The caseworker also testified that, after respondent-father relapsed, additional services were offered to him, including random drug screens, substance-abuse counseling, support groups, and a referral to the Family Reunification Program (FRP), which was an intensive program that could have aided him in dealing with relapse, but he was unsuccessfully discharged from the program.

The record establishes that the DHHS *did* provide respondent-father with services beyond the FRP while LM was placed with him. Despite the DHHS's efforts, however, once respondent-father relapsed, he stopped participating in all services and exhibited a disinterest in participating in services that continued through the termination hearing. The DHHS should not be blamed for respondent-father's failure to participate in the services offered to him. Indeed, the DHHS made reasonable efforts, but respondent-father failed to participate in, or benefit from, them. Therefore, respondent-father is not entitled to relief based on the alleged lack of reasonable efforts to reunify him with LM.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Respondent-father next insists that he was denied effective representation because the trial court allowed a substitute attorney to represent him at the termination hearing in place of his court-appointed attorney. This Court has ruled that, "[a]lthough the constitutional provisions explicitly guaranteeing the right to counsel apply only in criminal proceedings, the right to due process also indirectly guarantees assistance of counsel in child protective proceedings." *In re CR*, 250 Mich App 185, 197; 646 NW2d 506 (2002), overruled in part on other grounds by *In re Sanders*, 495 Mich 394; 852 NW2d 524 (2014). Accordingly, "the principles of effective assistance of counsel developed in the context of criminal law apply by analogy in child protective proceedings." *Id.* at 197-198. To obtain relief on that basis, respondent-father must demonstrate "that (1) counsel's performance was deficient, falling below an objective standard of reasonableness, and that (2) the deficient performance prejudiced the respondent." *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). Effective assistance "is presumed, and a party claiming ineffective assistance bears a heavy burden of proving otherwise." *In re Casto*, 344 Mich App 590, 612; 2 NW3d 102 (2022).

Although respondent-father did not attend the termination hearing, he now asserts that his substitute attorney was ineffective during that hearing because he was unfamiliar with the case and unprepared for the hearing. To support that claim, respondent-father cites four specific issues that arose during the termination hearing that he characterizes as proof of ineffective assistance. We find that those four issues, whether considered in isolation or in concert, cannot satisfy respondent-father's burden to establish that he received inadequate representation at the termination hearing.

First, respondent-father contends that his attorney was unaware if respondent-father knew the trial court was changing the permanency planning goal for respondent-mother from adoption to reunification. The portion of the termination hearing that respondent-father cites to support this claim includes his attorney's question to caseworker Joi Winborne about whether *the caseworker* knew whether respondent-father was aware of the goal change. Therefore, the question does not establish that the attorney himself did not know if respondent-father was aware of the goal change. Instead, it simply appears that the attorney was questioning the caseworker about the goal change and respondent-father's knowledge of it in order to thoroughly develop the record.[2] That question was necessary because respondent-father did not attend the termination hearing, where he plainly would have learned about the goal change if he had not heard of it before that date.

---

[2] As respondent-father's attorney explained, "without a client I'm going to try to protect his rights the best I can."

Second, respondent-father contends that his attorney was not aware that, at the termination hearing, respondent-mother was claiming that respondent-father was not LM's biological father. The portion of the termination hearing that respondent-father cites to support his argument consists of respondent-mother's answer when she was asked to identify LM's father. She stated: "Legally it's [respondent-father]." Nowhere in the cited portion of the termination hearing (or in any other place in the termination hearing) did respondent-mother state that respondent-father was not LM's biological father. Respondent-mother was upset about respondent-father's lack of compliance and participation in the proceedings. Her statement that respondent-father was "[l]egally" LM's father appeared to capture that frustration. But respondent-mother never claimed that respondent-father was not LM's biological father, so respondent-father's attorney had no reason to know of any such claim.

Third, respondent-father contends that his attorney had limited knowledge of respondent-father's efforts early in the case to obtain custody of LM. The portion of the termination hearing that respondent-father identifies to support that contention includes his attorney's questions to the caseworker about the timeline for LM's placement with respondent-father. The questions do not establish that the attorney was unfamiliar with the timeline or facts of the case. Instead, it appears that the attorney was thoroughly examining the caseworker in order to develop a complete record.

Finally, respondent-father asserts that his attorney did not know when LM was placed with respondent-father and when LM was removed from respondent-father's care. The sections of the termination hearing respondent-father cites to support that claim include the attorney's questions to the caseworker about (1) respondent-father's compliance with services after first being released from prison, (2) the child's placement with respondent-father by the trial court, and (3) respondent-father's relapse and the services provided to him. Those questions do not establish that the attorney was unaware of the underlying facts of the case. Rather, it seems that the attorney was well-versed in the history of the matter and thoroughly asked questions in order to develop a complete record. The attorney's thoughtful questioning of witnesses at the termination hearing does not prove that he was unfamiliar with the case or unprepared for the hearing. Indeed, it appears that the attorney thought carefully about the questions necessary to develop a comprehensive timeline of events on the record, which cannot be characterized as unreasonable or deficient performance.

Beyond that, respondent-father has not explained how the purported deficient performance by his attorney resulted in any prejudice. At the time of the termination hearing on May 16, 2023, respondent-father had attended only one court hearing between March 2022 and May 2023, he had stopped communicating with his caseworker and his attorney, and no one knew where he was. In addition, respondent-mother testified that respondent-father continued to use methamphetamine. The caseworkers testified that respondent-father: (1) had made no progress on his parent-agency treatment plan; (2) was no longer submitting to drug testing; (3) had continued to show no interest in taking part in services and confusion about why he needed to participate in services; and (4) had not had any contact with LM since May 2022. When the termination hearing occurred, the case was more than three years old and respondent-father did not show any interest in working toward reunification with LM. Therefore, his attorney argued that, because the trial court and the DHHS changed the permanency goal for respondent-mother from adoption to reunification, termination of respondent-father's parental rights was unnecessary because respondent-mother could seek sole custody of LM through a domestic order and could keep LM safe. Because of respondent-father's poor performance, that was his attorney's only viable argument against termination. The fact that

that argument failed to convince the trial court does not support a finding of ineffective assistance of counsel. Instead, that fact establishes that nothing respondent-father's attorney did (or failed to do) at the termination hearing resulted in prejudice sufficient to justify overturning the trial court's order terminating respondent-father's parental rights.

Affirmed.

/s/ Christopher P. Yates
/s/ Mark J. Cavanagh
/s/ Mark T. Boonstra